144 F.3d 1014
 22 Employee Benefits Cas. 1172,
Pens. Plan Guide (CCH) P 23946Z
Pamela Hertel MERS, Plaintiff-Appellant,
v.
MARRIOTT INTERNATIONAL GROUP ACCIDENTAL DEATH and
DISMEMBERMENT PLAN, Defendant-Appellee.
 No. 97-1039.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 20, 1997.
Decided May 8, 1998.*
 
 Donald C. Clark, Jr., Jennifer S. Holloway (argued), Clark & DeGrand, Chicago, IL, for Plaintiff-Appellant.
 P. Kevin Connelly, Martin Harris (argued), David N. Michael, Connelly, Sheehan & Moran, Chicago, IL, for Defendant-Appellee.
 Before BAUER, FLAUM, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 Mers appeals the district court's affirmance of Marriott International Group Accidental Death and Dismemberment Plan's denial of her claim for benefits. She asserts that two ERISA policies cover her husband's death. Because the denial was based on a reasonable interpretation of the terms of both policies, we affirm the decision of the district court.
 
 I. HISTORY
 A.
 
 2
 Dale Mers worked for Marriott International, Inc. ("Marriott") as a Director of National Sales. On January 4, 1994, as part of his job, he attended a five-day conference sponsored by the Professional Convention Management Association. The kick-off for the conference was a volunteer project with Habitat for Humanity rehabilitating a home. Dale Mers was feeling well, but his participation in this project required an unusual amount of physical exertion for him. He used a sledge hammer and a crow-bar to tear down a plaster wall. While engaged in this activity, he complained of chest pains and collapsed.
 
 
 3
 Although he was rushed to a hospital, Dale Mers died early in the morning of January 6, 1994. At the time of his death, he was forty-four years old, had non-insulin diabetes, high cholesterol, and was approximately thirty to forty pounds overweight. However, he had never been treated for coronary or vascular problems nor been determined to have any problems with hypertension.
 
 
 4
 No autopsy was performed on Dale Mers because his family had his body cremated one day after his death. The death certificate listed the cause of death as cardiac arrest due to cerebral hemorrhage resulting from a brain stem infarction. In layman's terms, he had a heart attack because a blood vessel in his brain burst.
 
 B.
 
 5
 The Marriott International Group Accidental Death and Dismemberment Plan ("Plan") is a welfare benefit plan that Marriott provides for its employees. It is governed by ERISA. See 29 U.S.C. § 1001 et seq. American International Group ("AIG"), a holding company that operates insurance companies through subsidiaries, is insurer of the Plan. A subsidiary of AIG issued policies insuring the Plan's benefits.
 
 
 6
 Marriott employees may choose from two types of accidental death and dismemberment coverages under the Plan. The first is a Business Travel Accident policy ("BTA") that Marriott provides automatically to every salaried employee. Dale Mers was eligible for $100,000 in benefits. The second is a 24-Hour Optional policy ("24-Hour") that Marriott offers to all salaried employees as additional coverage if the employee elects to enroll and pays premiums commensurate with the coverage amount selected. Dale Mers enrolled in the 24-Hour policy for $100,000 in benefits. Pamela Mers ("Mers") was her husband's designated beneficiary.
 
 
 7
 A summary plan document ("SPD") encapsulates the scope of coverage and exclusions for these policies. The BTA policy provides insurance protection if the insured should die or lose limbs, eyesight, speech, or hearing in an accident while traveling on Marriott business. The 24-Hour policy pays benefits if the insured suffers an accidental loss of life, limbs, eyesight, speech, or hearing at any time regardless of whether the person is engaged in Marriott business. Both policies exclude coverage for a loss caused by or resulting from disease of any kind.
 
 
 8
 Both policies also have the same definition of an injury. The policies define "injury" as "bodily injury caused by an accident ... and resulting directly and independently of all other causes." The BTA policy has this definition only in its policy terms and not in the SPD; the 24-Hour policy has this definition in both locations.
 
 C.
 
 9
 Shortly after Dale Mers' death, Marriott provided Mers with a copy of the SPD and a profile of benefits as of January 7, 1994. This profile stated that her husband had $100,000 in accidental death coverage. Unaware that her husband had enrolled in the 24-Hour policy, Mers assumed that this $100,000 coverage was under the BTA policy in which her husband was automatically enrolled.
 
 
 10
 In submitting Mers' claim to the Plan, however, Marriott erroneously included only a copy of Dale Mers' enrollment form for the 24-Hour policy. Marriott did not notify the Plan of Dale Mers' enrollment in the BTA policy and did not file a formal claim with the Plan for BTA benefits. Thus, the Plan considered only the terms of the 24-Hour policy in evaluating Mers' claim for benefits. The Plan was unaware that Mers had a potential claim for benefits under the BTA policy.
 
 
 11
 After Mers submitted a proof of claim form, Marriott forwarded it to American International Company ("AIC"), a subsidiary of AIG, to whom AIG had delegated its duties under the Plan. On August 3, 1994, AIC denied Mers' claim for benefits. Among other reasons, the letter cited the definition of injury found in the policies and the disease exception in concluding that the 24-Hour policy did not cover Dale Mers' death. Under the terms of the 24-Hour policy, AIC concluded that an accident did not cause his death.
 
 
 12
 AIC based its determination on its investigation of the circumstances surrounding Dale Mers' death, its review of his medical records, and its receipt of the medical opinions of Drs. Daniel Hier and Jack Harnes. Dr. Hier concluded that the exertion that this job placed on Dale Mers, who was not used to performing physical labor, precipitated a sudden rise in blood pressure producing an intracerebral hemorrhage. Although Dr. Hier was unable to conclude whether an aneurysm or arteriosclerosis caused the localized weakening in the blood vessel's wall, Dr. Hier was able to conclude that Mers' participation in the Habitat project was not the sole cause of death. Dr. Harnes, AIC's medical consultant, also opined that the death was not independent of other causes. He concluded that arteriosclerosis resulting from Dale Mers' diabetes played a role in causing the blood vessel to rupture.
 
 
 13
 Mers appealed the Plan's denial. In support of her appeal, Mers submitted the medical opinion of Dr. Allan Aven. Dr. Aven's report discussed Dale Mers' activity just prior to his collapse and opined that the unusual and extreme physical exertion which Dale Mers experienced working on the Habitat for Humanity project precipitated his cerebral hemorrhage. Even though he argued that exertion was the primary cause of death, Dr. Aven conceded that cholesterol plaque or congenital dysplasia may have previously weakened a blood vessel sufficiently to cause it to rupture. Thus, Dr. Aven agreed with his colleagues that the acute hemorrhage was at least partially the result of a ruptured cerebral aneurysm or a blood vessel weakened by arteriosclerosis. On December 8, 1994, AIC's appeals committee affirmed the denial of benefits.
 
 D.
 
 14
 Mers filed a complaint on December 22, 1995 asserting that Marriott wrongfully denied her claim for benefits in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). When the parties filed cross-motions for summary judgment, they realized that Mers could have asserted two claims, one under each policy. The court allowed Mers to amend her complaint. Both parties agreed that Mers never submitted a claim under the BTA policy for administrative review. The Plan offered to waive any timeliness defense, but Mers refused to proceed administratively, arguing that it would be futile. The district court agreed, reasoning that it would be extraordinarily wasteful and grossly inefficient to impose this requirement because the policies contain identical coverage and exclusion language. The court then addressed the merits of both claims.
 
 
 15
 The district court granted the Plan's motion for summary judgment, affirming the Plan's denial of Mers' claims. The court found that AIC, the plan insurer who made the denial decision, was operating under an inherent conflict of interest by serving both as the plan insurer and decision-maker. However, the lower court reviewed the denial under an arbitrary and capricious standard of review and held that the Plan's denial of benefits was reasonable because Dale Mers' death was not an "injury" as defined in the insuring policies. The court also upheld the Plan's denial of benefits based on the exclusion of losses caused by or resulting from a disease.
 
 
 16
 Mers appealed to this Court.
 
 II. ANALYSIS
 A.
 
 17
 We review a district court's decision to grant summary judgment de novo. See Buckley Dement, Inc. v. Travelers Plan Adm'rs, Inc., 39 F.3d 784, 787 (7th Cir.1994) (citing Tolle v. Carroll Touch, Inc., 23 F.3d 174, 178 (7th Cir.1994)). In performing this review, we analyze the record and controlling law under the same standard as the district court. See Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 990 (7th Cir.1993) (citing Soo Line R. Co. v. Overton, 992 F.2d 640, 643 (7th Cir.1993)). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is material only if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). To determine whether summary judgment is appropriate, we view the evidence and draw all reasonable inferences therefrom in a light favorable to the non-moving party. See id.
 
 1.
 
 18
 In reviewing a denial of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), we look for guidance to the Supreme Court decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Analogizing ERISA's provisions to traditional rules of trust law, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115, 109 S.Ct. at 956-57. Where a plan confers power on the administrator to exercise discretion, the appropriate standard of review is the deferential "arbitrary and capricious" one. See id. at 111, 109 S.Ct. at 954-55; see also Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 379-80 (7th Cir.1994).
 
 
 19
 In this case, we agree with the district court that the Plan gives AIG discretionary authority. In making that determination, we review the language of the Plan de novo, just as we would review the language of any contract. See Bechtold v. Physicians Health Plans, Inc., 19 F.3d 322, 325 (7th Cir.1994). The Plan names Marriott and AIG as fiduciaries with authority to control and manage the operation and administration of the Plan. The SPD, which sets forth the terms of both the BTA policy and the 24-Hour policy, gives Marriott sole, absolute, and final discretion to determine eligibility for benefits and to resolve any factual issues relevant to benefit eligibility or benefit enrollment. It also grants AIG sole, absolute, and final discretion to construe the terms of the Plan. No magic words are required to confer discretion. See Donato, 19 F.3d at 379. The terms of the Plan provide the fiduciaries with discretionary authority. See Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 815 (7th Cir.1997). As a result, we review Marriott's resolution of factual issues and AIG's construction of the terms of the Plan under the arbitrary and capricious standard of review.
 
 2.
 
 20
 Mers argues that we should apply a more strict version of the arbitrary and capricious standard when an ERISA plan affords deference to a fiduciary that has a conflict of interest in awarding benefits.[1] Her theory is that an inherent conflict of interest exists when a company sponsored plan allows an insurance company to interpret its own policies. She suggests that since an insurance company pays benefit claims out of its own assets, "its fiduciary role lies in perpetual conflict with its profit-making role as a business." Brown v. Blue Cross & Blue Shield, Inc., 898 F.2d 1556, 1561 (11th Cir.1990).
 
 
 21
 The district court concluded that AIC was operating under a conflict of interest. It afforded the Plan's decision less deference and viewed the Plan's decision to deny coverage for Dale Mers' death with greater suspicion. In making this determination, however, the district court presumed that Mers' request presented AIC with a conflict. Because we disagree with this presumption, we deny Mers' request for a reduction in deference.
 
 
 22
 While some courts have found that a denial of benefits is presumptively void and must be reviewed de novo where a similar conflict may exist, see Brown, 898 F.2d at 1561, we have not. See Chalmers v. Quaker Oats Co., 61 F.3d 1340, 1344 (7th Cir.1995); Van Boxel, 836 F.2d at 1048. We presume that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict. See Cuddington v. Northern Ind. Public Serv. Co., 33 F.3d 813, 816 (7th Cir.1994); Van Boxel, 836 F.2d at 1051, 1053. The existence of a potential conflict is not enough. See Cuddington, 33 F.3d at 816. Mers has not established an actual conflict or a significant one. In fact, she offers no evidence that a conflict exists other than her theory of an inherent conflict. This production is not enough to show an actual bias.
 
 
 23
 Previously, we have rejected the theory that an inherent relational conflict is sufficient to alter the standard of review by applying a law-and-economics rationale to establish that no conflict exists. See Chalmers, 61 F.3d at 1344; Van Boxel, 836 F.2d at 1051. In Chalmers, Chalmers argued that because his company's severance program was an unfunded ERISA plan, i.e., not funded by salary withholdings, the committee that approved benefits had an automatic bias against dispensing severance benefits since those funds came directly from the company's earnings. See 61 F.3d at 1344. In affirming the denial of his claim, we held that the impact on the company's welfare of granting or denying benefits under a plan was not sufficiently substantial to threaten an administrator's impartiality. See id.
 
 
 24
 For similar reasons, we find no inherent conflict of interest in this case. A decision to award Mers benefits would cost AIG $200,000. AIG has consistently been named as one of the fifty largest companies in the "Fortune 500" listing. The impact of granting or denying benefits in this case is minuscule compared to AIG's bottom line. See id. (noting that Quaker Oats, which generates revenue of nearly $6 billion annually, is "not likely to flinch at paying out $240,000"); Van Boxel, 836 F.2d at 1051 (recognizing that the amount may be "too slight to compromise the impartiality of the trustees").
 
 
 25
 Moreover, it is a poor business decision to resist paying meritorious claims for benefits. Companies like Marriott that sponsor ERISA plans are customers who choose which group insurance policies they will use to fund their plans. Mers and the Plan agree that these employers want to see their employees' claims granted because they want their employees satisfied with their fringe benefits. These corporate employers have the sophistication and bargaining power necessary to take their business elsewhere if an insurer like AIG consistently denies valid claims. In the long run, this type of practice would harm an insurer by inducing current customers to leave and by damaging its chances of acquiring new customers. See Chalmers, 61 F.3d at 1344 (finding a similar relationship between employers offering unfunded ERISA plans and their employees); Van Boxel, 836 F.2d at 1051 (same). Thus, no conflict of interest exists because paying meritorious claims is in AIG's best interest. Since Mers has not established that AIG had a significant conflict of interest, we will reverse a denial of benefits only if the denial is arbitrary and capricious.[2]
 
 B.
 
 26
 Mers contends that the district court erred by affirming the Plan's denial of benefits. She argues that the Plan acted arbitrarily and capriciously by incorporating a definition from the underlying policy that was not included in the SPD and by applying a disease exclusion where the evidence was insufficient to establish that Dale Mers suffered from a disease. For us to reverse the district court's grant of summary judgment for the Plan, Mers must succeed with both arguments as each determination by the Plan is a separate ground for denial. Because the Plan reasonably applied the definition of injury found in the policies, the district court did not err in affirming the Plan's denial of benefits.
 
 1.
 
 27
 Under the arbitrary and capricious standard, it is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority. See Cvelbar v. CBI Ill. Inc., 106 F.3d 1368, 1379 (7th Cir.1997). We also will not set aside a plan's denial of benefits if the denial was based on a reasonable interpretation of the plan documents. See Loyola Univ. v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir.1993). Our role is to determine whether the decision was completely unreasonable. See Chojnacki, 108 F.3d at 816; Van Boxel, 836 F.2d at 1053.
 
 
 28
 ERISA requires that an SPD be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). In particular, an SPD must list the circumstances in which disqualification, ineligibility, denial, or loss of benefits may occur. See 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102-3.
 
 
 29
 Mers claims that the Plan acted arbitrarily and capriciously by relying on a definition of injury that is in the underlying policy but not in the SPD.[3] The existence of an SPD does not eviscerate the underlying policy. Our job is to determine when the terms of the SPD control over the terms of the underlying policy.
 
 
 30
 a.
 
 
 31
 We recently addressed this question in Williams v. Midwest Operating Eng'rs Welfare Fund, 125 F.3d 1138, 1140-41 (7th Cir.1997). In that case, the SPD stated that it would cover hospital " 'charges for room and board ... if required for hospitalization or treatment due to a nonoccupational injury or illness.' " Id. at 1139 (quoting Summary at 12). The SPD excluded any illness or injury that was covered under workers' compensation, that was recoverable from a responsible third party, that resulted from an act of war, that affected anyone serving in the Armed Forces or any other government position, or that required treatment or services not prescribed by an eligible provider. See id. The SPD did not define the term "injury." However, the underlying plan defined injury as " 'bodily harm resulting from an accident. Accident as used in the foregoing, means an undesirable or unfortunate happening, unintentionally caused, resulting in harm.' " Id. at 1140 (quoting Plan at II-33).
 
 
 32
 In allowing Williams to rely on the SPD's terms over the plan's limitation, the court interpreted our case law which stated that " 'in the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, [the insured] is entitled to claim the former.' " Id. at 1141 (quoting Senkier v. Hartford Life & Accident Ins. Co., 948 F.2d 1050, 1051 (7th Cir.1991)). We also referred to the holdings of other circuits that have addressed this issue. See Hansen v. Continental Ins. Co., 940 F.2d 971, 982 (5th Cir.1991) (reasoning that "this Court holds that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern"); Edwards v. State Farm Mut. Auto. Ins. Co., 851 F.2d 134, 136 (6th Cir.1988) (holding that the SPD governs over the plan when there is a discrepancy); McKnight v. Southern Life & Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir.1985) (same).
 
 
 33
 Because the plan's definition of injury incorporated a basis for denial of coverage that was not found in the SPD, the court agreed with Williams that the SPD should control. We then applied the common meaning of injury and estopped the Fund from using the Plan's language to deny Williams coverage. See 125 F.3d at 1141.
 
 
 34
 b.
 
 
 35
 Now, in retrospect, we erred in our Williams analysis in two ways. First, we did not decide whether the SPD in question satisfied ERISA's disclosure requirements. See 29 U.S.C. § 1022(a), (b). While it is true that courts must fashion federal common law to govern ERISA suits in an effort to promote uniformity, see Sullivan v. Cox, 78 F.3d 322, 326 (7th Cir.1996), we only turn to this common law when ERISA is silent on an issue, see Phillips v. Lincoln Nat. Life Ins. Co., 978 F.2d 302, 311 (7th Cir.1992). If an SPD does not satisfy ERISA's disclosure requirements, a court may estop a plan administrator from denying coverage for terms not included in the SPD but found in the underlying plan.[4]
 
 
 36
 Second, we took an incorrect reading of our prior position on when terms of an SPD control over terms of the underlying policy.[5] Williams suggests that the terms of an SPD control over the terms of the underlying document if any discrepancy exists between them. See id. at 1141 (quoting Senkier, 948 F.2d at 1051). The Williams court found that a discrepancy exists when a definition provided only in the plan of a term used in the SPD is inconsistent with the common meaning of the term. See id. This interpretation of our precedent is not entirely accurate. We allow a participant or beneficiary to rely on the SPD and estop the plan administrator from denying coverage because of terms not included in the SPD only if there is a direct conflict between the SPD and the underlying policy. See Senkier, 948 F.2d at 1051; Fuller v. CBT Corp., 905 F.2d 1055, 1060 (7th Cir.1990).
 
 
 37
 In Senkier, we decided "whether a mishap in the course of treatment should be classified as part of the treatment itself or as an accident." 948 F.2d at 1051. The SPD in that case offered 24-hour protection against accidents anywhere in the world with the usual exclusions. See id. The SPD also referred the participant to the insurance policy itself for the details, and "the policy expressly exclude[d] not only 'sickness or disease' but also 'medical or surgical treatment of a sickness or disease.' " Id.
 
 
 38
 After realizing that our question did not depend on any specific provisions of ERISA, we exercised "our power to formulate federal common law principles suitable for the governance of pension and employee benefit trusts." Id. (citing Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 281 (7th Cir.1990) (en banc)). In doing so, we rejected Senkier's argument that the plan was estopped from denying coverage because she relied on the SPD, reasoning that:
 
 
 39
 [I]n the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, [an insured] is entitled to claim the former....
 
 
 40
 But only if there is a contradiction between the summary plan document and the policy. There is not [a contradiction] in a case such as this where the policy clarifies rather than contradicts the summary.
 
 
 41
 Id. Thus, in the Seventh Circuit, an SPD's silence on an issue does not estop a plan from relying on the more detailed policy terms when no direct conflict exist. See Herrmann v. Cencom Cable Assocs., Inc., 978 F.2d 978, 983 (7th Cir.1992) (allowing plan to enforce 45-day time limit contained in plan, despite its omission from the SPD, because an SPD does not prevail over the plan itself when the SPD is merely silent).
 
 
 42
 Moreover, we are not the only court to draw this distinction. While the circuits agree that an SPD controls if a conflict exists between the underlying policy and the SPD, see Helwig v. Kelsey-Hayes Co., 93 F.3d 243, 247 (6th Cir.1996); Aiken v. Policy Management Systems Corp., 13 F.3d 138, 140 (4th Cir.1993); Hansen, 940 F.2d at 982; Alday v. Container Corp. of Am., 906 F.2d 660, 666 (11th Cir.1990), many of these courts also agree with us that this rule of construction should not be invoked if no direct conflict exists or if the SPD is silent on an issue that is described in the underlying policy, see Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir.1998) (en banc) (holding that the principle that the terms of the SPD control when they conflict with the terms of the underlying plan does not apply when the SPD is merely silent on an issue because "[a]n omission from the summary plan description does not, by negative implication, alter the terms of the plan itself"); Martin v. Blue Cross & Blue Shield of Va., Inc., 115 F.3d 1201, 1204 (4th Cir.1997) (reasoning that underlying plan will control unless plaintiff can prove conflict between plan and SPD); Jensen v. SIPCO, Inc., 38 F.3d 945, 952 (8th Cir.1994) (holding that silence in an SPD does not override specific provisions in the underlying plan); Wise v. El Paso Nat. Gas. Co., 986 F.2d 929, 938 (5th Cir.1993) ("While clear and unambiguous statements in the summary plan description are binding, the same is not true of silence.").
 
 
 43
 If silence in the SPD were enough to trump the underlying plan, then SPDs would mushroom in size and complexity until they mirrored the plans. "Larding the summary with minutiae would defeat that document's function: to provide a capsule guide in simple language for employees." Herrmann, 978 F.2d at 984; see also Lorenzen v. Employees Ret. Plan of Sperry & Hutchinson Co., 896 F.2d 228, 236 (7th Cir.1990) ("[A] plan summary is not required to anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status.... If it were, the summaries would be choked with detail and hopelessly confusing."). Clarity and completeness are competing goods. See Lorenzen, 896 F.2d at 236. We have accounted for these dueling considerations by allowing claimants to rely on an SPD when the policy terms contradict.
 
 
 44
 Thus, we reaffirm our pre-Williams position that, as long as an SPD satisfies ERISA's requirement that it is accurate and sufficiently comprehensive to reasonably apprise plan participants of their rights and obligations, see 29 U.S.C. § 1022, a participant or beneficiary may rely on an SPD and estop a plan administrator from denying coverage for terms found in the underlying policy only if there is a direct conflict between an SPD and the underlying policy. See Herrmann, 978 F.2d at 983; Senkier, 948 F.2d at 1051; Fuller, 905 F.2d at 1060.
 
 
 45
 c.
 
 
 46
 In this case, the SPD satisfies ERISA's disclosure requirements and the definition of injury in the underlying policy clarifies the terms of the SPD. The SPD for the BTA policy is accurate and sufficiently comprehensive to reasonably apprise its participants and beneficiaries. See 29 U.S.C. § 1022. It provides coverage for accidents and has an exclusion for a disease of any kind. Thus, the BTA policy does not cover circumstances when a disease is the sole cause of death.
 
 
 47
 The problem with this SPD is that it does not explain whether the Plan provides benefits in a situation where there are multiple causes for an accidental death. Both parties agree that multiple reasonable interpretations exist for when an accident triggers coverage; under the language of this SPD, the Plan could require an accident to be the sole cause, the predominant cause, or simply a contributing cause of death. The definition of injury found in the underlying policies resolves this question. The BTA policy defines an injury to mean bodily injury caused by an accident and resulting directly and independently of all other causes. This definition clarifies the question surrounding accidents with multiple causes. Because the definition clarifies and does not contradict the terms of the SPD, Mers cannot estop the Plan from denying coverage based on the clarifying terms of the underlying policies.
 
 2.
 
 48
 Finally, we hold that AIC construed the definition of injury reasonably. All the medical evidence available suggests that Dale Mers' death did not result directly and independently from his physical exertion. Although none of the doctors could state definitively whether it was an aneurysm or arteriosclerosis that assisted in causing the
 
 
 49
 massive cerebral hemorrhaging, they all agreed that Dale Mers' physical exertion was not the only cause of death. Given this uncontroverted basis of factual support, it was reasonable for AIC to construe the definition of injury to prevent Mers from recovering benefits. The district court did not err in affirming the Plan's denial of benefits.
 
 
 50
 For all the above reasons, we AFFIRM the judgment of the district court.
 
 
 
 *
 An opinion in this case was originally issued on February 24, 1998. Thereafter, on April 15, 1998, that opinion was vacated sua sponte. Because we overrule our prior precedent found in Williams v. Midwest Operating Eng'rs Welfare Fund, 125 F.3d 1138 (7th Cir.1997), this opinion has been circulated pursuant to Circuit Rule 40(e). A majority of the active judges on the court did not favor a rehearing en banc. Circuit Judges Cummings and Rovner voted to grant rehearing en banc
 
 
 [1]
 The arbitrary and capricious standard does not pose an all-or-nothing choice between full deference or none. Courts may vary the deference incrementally to account for the strength or weakness of a specific conflict of interest. See Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1049-52 (7th Cir.1987)
 
 
 [2]
 Mers also argues that the district court erred in affording deference to AIC's factual determinations. More specifically, Mers claims that the Plan's delegation of its fiduciary duty to AIG voided any deference that the district court may owe the Plan's factual findings under the terms of the policies. Because we are affirming the denial of benefits on the independent ground that AIG reasonably interpreted the policies, we do not need to resolve this issue. To make our determination, we are not required to decide whether Dale Mers suffered from a pre-existing condition or a disease. We simply need to resolve whether the Plan reasonably concluded that the accident was not the sole cause of Dale Mers' death, and both parties agree that there were multiple causes
 
 
 [3]
 This argument only applies against the BTA policy. While the district court was correct in concluding that the terms of the policies are the same, the 24-Hour policy includes the definition of injury in its SPD. This distinction, however, does not alter the policies in any material fashion. Thus, we agree with the lower court that it would be futile to require Mers to exhaust her administrative remedies
 
 
 [4]
 If in Williams we had reviewed whether the SPD satisfies 29 U.S.C. § 1022, the same conclusion would have been reached without addressing whether the terms of the underlying plan contradicted or clarified the terms of the SPD. ERISA requires that SPDs list the circumstances in which disqualification, ineligibility, denial, or loss of benefits may occur and be "sufficiently accurate and comprehensive to reasonably apprise" participants and beneficiaries. Id. According to Williams, the plan's definition of injury incorporated a basis for denial of coverage-whether the injury resulted from an accident--that the SPD did not address. See 125 F.3d at 1141. Thus, we would have concluded that the SPD did not list all the circumstances where denial may occur. See 29 U.S.C. § 1022(b)
 
 
 [5]
 We consider the Williams analysis to be a misstatement of our prior decisions and not an overruling. We require compelling reasons to overturn Circuit precedent. See Mid-America Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1364 (7th Cir.1996). Our general rule is to give considerable weight to our own decisions " 'unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling.' " Haas v. Abrahamson, 910 F.2d 384, 392 (7th Cir.1990) (quoting Colby v. J.C. Penney Co., 811 F.2d 1119, 1123 (7th Cir.1987)). The court in Williams did not suggest that it was overruling our earlier approach and it did not provide a compelling reason for doing so. We therefore are not inclined to interpret its approach in that light