**Barbara MATTIAS, Plaintiff,**

v.

**COMPUTER SCIENCES CORPORATION, Continental Casualty Company, and the CNA Insurance Companies, Defendants.**

**No. 97–666L.**

United States District Court,
D. Rhode Island.

Feb. 2, 1999.

Robert V. Chisholm, Chisholm & chisholm, Providence, RI, for plaintiff.

Jean M. Kelley, Boston, MA, Stephen P. Harten, Morrison, Mahoney & Miller, Providence, RI, for defendants.

*DECISION AND ORDER*

LAGUEUX, Chief Judge.

Barbara Mattias ("plaintiff") was working for Computer Sciences Corporation when she suffered a back injury in January 1995. She has sued her employer, Continental Casualty Company and the CNA Insurance Companies (collectively "defendants") for long term disability payments that she believes she should receive under Computer Sciences Corporation's ERISA plan. Plaintiff received "total disability" benefits from July 1995 to July 1997, but the parties disagree now on whether she qualifies for "partial disability" benefits thereafter.

In plaintiff's job, she entered data into computers and lifted boxes of computer paper. In September 1995, Dr. Thomas L. Green reported that plaintiff suffered a herniated disc with sciatica in her lower back. The condition had originated on January 24, 1995. Plaintiff was covered by Computer Sciences Corporation's employee benefit pro-

gram, which was insured and administered by CNA Insurance Companies' Continental Casualty Company. Plaintiff does not claim total disability benefits after July 1997. Although the back injury prevents plaintiff from returning to her former job, she could return to other, less-physically straining employment. In March 1997, plaintiff's physician Dr. Philo F. Willetts, Jr. reported that:

> She could return to a variety of light and sedentary jobs. Her restrictions would be to avoid more than an occasional bending, avoid lifting more than 20 pounds, and avoid working in tight compartments. She could sit, stand, walk and drive, so long as she could frequently change positions as comfort dictated. She could occasionally climb and descend stairs. She could use her feet for foot pedal controls and use her hands without further restrictions.

(Record at 132 (attached to Aff. of William C. Lerette)). Dr. Willetts went on to state that based upon the AMA Guidelines, he would rate plaintiff as having a 5% permanent partial impairment of the whole person; he stated that this would be equivalent to a 7% permanent partial physical impairment of the lumbar spine. Therefore, plaintiff is not totally disabled, but she suffers some disability. The dispute is whether plaintiff qualifies for partial disability benefits, and that depends on how "partial disability" is to be defined in this case.

Following ERISA's requirements, defendants published two documents describing Computer Sciences Corporation's employee benefit program: the detailed plan description (the "CSC Plan") and a summary in the employee handbook (the "CSC Summary").

The CSC Summary contained language that:

> "[i]n the event you are partially disabled you are eligible to receive benefits to assist your return to your previous profession... [Following] a period for which you received Total Disability ... benefits, you will receive a Partial Disability benefit for each month that you are partially disabled."

(CSC Summary at 7–3) (attached as Exhibit E to Aff. of Barbara Mattias). The CSC Plan contained the following language:

"Partial disability" means that the Insured Employee, because of Injury or Sickness is:

(1) continuously unable to perform the substantial and material duties of his regular occupation;

(2) under the regular care of a licensed physician other than himself; and

(3) gainfully employed in his regular occupation on a partial and/or part-time basis.

(Record at 15 (attached to Aff. of William C. Lerette).)

Plaintiff argues that her doctor has found her to be partially disabled, and under the CSC Summary, she is eligible to receive benefits. Defendants argue that the CSC Plan's definition controls this case, and because plaintiff has not returned to her regular occupation on a partial and/or part-time basis, she is not eligible.

For the reasons outlined below, this Court holds that the CSC Summary's language controls and plaintiff is eligible for partial disability benefits. Defendants' motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted as to liability.

## I. Legal Standard for Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "A dispute as

to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. See *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991).

The coincidence that both parties move simultaneously for summary judgment does not relax the standards under Rule 56. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996). Barring special circumstances, the Court must consider each motion separately, drawing inferences against each movant in turn. *See id.*

## II. *Standard of Review*

When this Court reviews decisions by benefit providers in ERISA cases, it lacks stable, deep-rooted rules like those that govern motions for dismissal or summary judgment. Plaintiffs appeal a variety of decisions. They raise issues that range from factual to legal, and appellate decisions have, at times, done more to raise academic issues than to settle practical procedures.

█ Therefore, it is unclear what deference the First Circuit would have a district court apply in determining whether the CSC Summary or the CSC Plan controls. At its core, the question is whether this is a contract interpretation within this Court's plenary power or a special ERISA decision governed by *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In this case, the issue is immaterial because either analysis leads this Court to conclude that the standard of review is de novo. However, this writer addresses the question both to ensure that this case is correctly decided and to note the lack of clarity to other courts.

### A. Does "Firestone" deference apply where an insurance company interprets federal common law?

█ This Court last addressed the standard of review in ERISA cases in *Grady v. Paul Revere Life Ins. Co.*, 10 F.Supp.2d 100 (D.R.I.1998).[1] There, this Court applied *Firestone* to benefit denials based on factual determinations. *See Grady*, 10 F.Supp.2d at 110. Where an ERISA plan confers discretionary authority upon the administrator to determine eligibility for benefits or to construe the terms of the plan, the district court is to apply the arbitrary and capricious standard of review to the administrator's determinations. If the plan does not confer such authority, then review is de novo. *See id.*

If plaintiff were appealing a decision in which defendants merely found that plaintiff's injury did not meet the definition of disability, then this Court would happily follow the *Grady* analysis. However, defendants' decision was not factual. The parties agree on the key facts about plaintiff's injury and physical condition. Instead, defendants interpreted the Computer Sciences Corporation's ERISA plan and found that the contract did not award partial disability benefits to a person in plaintiff's condition. The First Circuit has at least suggested that there are

1. This Court also recently discussed ERISA's standard of review in *Tavares v. UNUM Corp.*, 17 F.Supp.2d 69 (D.R.I.1998). In that decision, this Court discussed *Firestone/Grady* and whether it should grant deference to UNUM's decision-making. *See Tavares*, 17 F.Supp.2d at 75–77.

In retrospect, that discussion may have been unnecessary and merely dicta. In that case, this writer found that UNUM had violated the law. The company violated ERISA when it denied

Tavares' benefits. Therefore, the posture was identical to this case. The standard of review appears to be set by *Recupero* because this Court made a legal determination rather than merely review UNUM's decision. That case was identical to this case in outcome as well because this Court would have applied de novo review under either *Firestone/Grady* or *Recupero* analysis.

This writer notes *Tavares* to emphasize that this question is both common and unresolved.

some decisions that this Court may review without deference:

> If, instead, the reviewing court determines that the plan provisions are ambiguous or otherwise unclear, in some respect material to the outcome of the case, this determination of lack of clarity does not necessarily lead to treating the issue of meaning as one for decision by findings of fact in the district court (either by a jury or by the district judge). Instead, interpretive issues of this kind may be decided by the court as matters of law are decided, or they may be partly decided in court and partly on remand to the out-of-court decisionmakers, or applicable law may require some other allocation of decisionmaking functions.

*Recupero v. New England Tel. & Tel. Co.,* 118 F.3d 820, 836 (1st Cir.1997).

This language is dictum. It was irrelevant to the outcome of *Recupero* and includes far too many conditional clauses to settle the issue for trial courts. However, the Computer Sciences Corporation's benefit plan is unclear in a way material to this case. This Court must interpret the CSC Plan and CSC Summary and decide on their ultimate legal meaning. As explained further below, courts have created federal common law directly on point, (*see* Section III), and judges do not generally defer to insurance companies in the application of federal common law. *Recupero* suggests that a district court would decide that kind of issue "as matters of law are decided," apparently meaning without deference to the lower decision-maker. *See id.* This Court would decide the law on its own, and it would uphold or overturn the benefits administrator's decision accordingly. In other words, this Court would utilize de novo review.

### B. *Applying "Firestone" to this case*

In this case, de novo review is also what this Court would undertake after a *Firestone/Grady* analysis. In *Grady,* this Court found that the policy at issue contained no language granting discretionary authority to the insurance company. *See Grady,* 10 F.Supp.2d at 110. This Court found that such authority could not be inferred from provisions in the policy that require claimant to submit proof of claim, proof of loss and written proof of entitlement. *See id.*

In this case, defendants argue that the CSC Plan includes the discretionary authority where it notes that benefits will be paid only "after [the Administrator] receive[s] due written proof of loss." (*See* Record at 21) (attached to Aff. of William C. Lerette). Defendants argue that this is

> a description of the process undertaken by the Administrator in determining whether or not benefits will be provided. This is precisely the type of language that has been relied upon by a number of courts in finding that the Administrator has been provided with a grant of discretion.

(Reply of the D.s to Pl.'s Mem. of Law in Supp. of Objection to D.s' Mot. For Summ. J. at 1–2.)

In fact, the CSC Plan provisions are virtually identical to the *Grady* provisions, and as such, they are flatly insufficient under *Firestone* and First Circuit precedents. *See Grady,* 10 F.Supp.2d at 110 (collecting cases). They are simply garden-variety contract terms specifying the procedure by which claims are to be processed and by which the policy is to be administered. The CDC Plan did not give defendants the last word in interpreting the contract or in determining eligibility for benefits.

Therefore, this Court concludes that review by this Court will be de novo under either *Firestone/Grady* or *Recupero.* The First Circuit has been unclear whether a district court would ever defer in a case where an ERISA plan gave the benefit administrator the discretion to interpret federal common law. This Court cannot believe that ERISA gives employers the power to contract for the exercise of such judicial power. However, the Computer Sciences Corporation's ERISA plan certainly lacks such language. Therefore, the issue is not controlling in this case, and this Court will not muddle the waters with dicta.

### III. *The Summary vs. The Plan*

The crux of this dispute is that, unlike most contracts in which a single writing con-

trols the agreement, an ERISA plan has two documents. Congress requires that an employer create both a detailed explanation of the ERISA plan ("the Plan Documents") and a summary for employees to read (the "SPD"). *See* 29 U.S.C. § 1022(a). By design, the documents differ. The issue in this case is how a court should interpret an ERISA plan where the SPD uses words with relatively broad definitions, and the Plan Documents contain a more restricted limiting definition of those words.

## A. *The Law of SPDs and Plan Documents*

The First Circuit has not ruled on this issue, although other courts have devised two independent doctrines where the SPD and the Plan Documents do not read identically.

### 1. *The two doctrines in tension*

First, where an SPD and the Plan Documents contradict or conflict with each other, the SPD controls. *See Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan,* 144 F.3d 1014, 1023 (7th Cir.1998); *Sprague v. General Motors Corp.,* 133 F.3d 388, 400 (6th Cir.1998); *Aiken v. Policy Management Sys. Corp.,* 13 F.3d 138, 140 (4th Cir.1993); *Senkier v. Hartford Life & Accident Ins. Co.,* 948 F.2d 1050, 1051 (7th Cir.1991); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 981–82 (5th Cir.1991); *Heidgerd v. Olin Corp.,* 906 F.2d 903, 908 (2d Cir.1990). The policy rationale for this rule is that the ERISA statute contemplates that employees will depend on the SPD, and if the Plan Documents are allowed to supersede, then the SPD is useless. *See, e.g., Moriarity v. United Tech. Corp. Represented Employees Retirement Plan,* 158 F.3d 157, 160 (2d Cir.1998) (citing *Heidgerd,* 906 F.2d at 907–08).

Second, where an SPD is silent on an issue, the Plan Documents control. *See Mers,* 144 F.3d at 1023; *Sprague,* 133 F.3d at 401; *Martin v. Blue Cross & Blue Shield of Va., Inc.,* 115 F.3d 1201, 1205 (4th Cir.1997); *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994); *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 938 (5th Cir.1993). The policy rationale for this view is that if silence in the SPD were enough to trump an underlying plan, then SPDs would mushroom in size and complexity until they mirrored the Plan Documents. *See, e.g., Mers,* 144 F.3d at 1024.

At the extremes, these two doctrines work. This Court would have no difficulty applying them if the CSC Summary had made no mention of partial disability coverage or if the CSC Summary included a detailed definition of "partial disability" that conflicted with the CSC Plan. However this case occupies the swath where neither rule controls perfectly and where the two policies are in tension, namely where an SPD uses a term and then the Plan Documents define that term. The CDC Summary says that partial disability benefits are available, and the CDC Plan defines "partial disability." Using merely common sense, it is not obvious that this situation is either a "conflict" or "silence" on the issue of partial disability benefits.

This Court notes that Congress wanted SPDs to be accurate and sufficiently comprehensive to reasonably apprise plan participants of their rights and obligations. *See* 29 U.S.C. § 1022(a). Yet SPDs can never be shorter than the Plan Documents and still cover everything exactly the same. This is not a rare tension in language, especially legal language. The perfect document would be simple enough for anyone to understand and be complete enough to cover every contingency. The problem is that clarity and completeness are competing goals. *See Mers,* 144 F.3d at 1024. Thus, there are cases where an SPD uses a term and then the Plan Documents define that term. The question is when does that qualify as a conflict?

### 2. *"Mers" and the Seventh Circuit*

The most-recent significant discussion of this issue was by the Seventh Circuit in *Mers,* 144 F.3d at 1021–24. The *Mers* Court noted that another Seventh Circuit panel had held a year before that conflict exists when the Plan Documents' definition of a term used in an SPD contradicts "the common meaning of the term." *Mers,* 144 F.3d at 1023 (citing *Williams v. Midwest Operating Eng'rs Welfare Fund,* 125 F.3d 1138, 1141 (7th Cir.1997)). The *Mers* Court clearly re-

jected that outcome.[2] Unfortunately, it explained its reasoning in murky language. The *Mers* Court held that an SPD controls only where it is in "direct conflict" with the Plan Documents. *See id.* (citing *Senkier v. Hartford Life & Accident Ins. Co.,* 948 F.2d 1050, 1051 (7th Cir.1991)). Nowhere does *Mers* or *Senkier* define "direct conflict" or explain when a district court should find one.

Apparently, the Seventh Circuit considers any definition in Plan Documents to be merely a "clarification" of the SPD. *See id.* Thus, unless the word or phrase is defined explicitly in both documents and those definitions conflict, the SPD is "silent" on the issue, and the Plan Documents control.

That cannot be the correct analysis because it eviscerates the SPD of any legal significance. To serve the language and the obvious intention of ERISA, the correct rule must be the "common meaning" rule from *Williams* that was rejected by *Mers.* The Seventh Circuit offers no explanation other than stare decisis as to why it vacated *Williams.* However, that Circuit's own precedent in *Senkier,* along with cases from the Second, Ninth and other circuits, show that conflict occurs where an SPD uses a term and the Plan Documents define it in a fashion inconsistently with the term's common meaning.

### 3. *Test: Definition conflicts with common meaning*

The crux of this case is that Congress wrote ERISA to require that the SPD be "sufficiently accurate and comprehensive to reasonably apprise" the plan participants of their rights under the plan. 29 U.S.C. § 1022(a). The SPD is not merely a courtesy that employers and insurance companies provide to plan members. Congress intended that those members be able to rely on the words of the SPD to understand their coverage and that those words be "written in a manner calculated to be understood by the average plan participant". 29 U.S.C. 1022(a).

In fact, courts looking for conflict between a term in an SPD and its definition in the

Plan Documents often explicitly discuss how a reasonable employee would read the SPD. *See, e.g., Moriarity,* 158 F.3d at 160–61; *Adams v. J.C. Penney Co., Inc.,* 865 F.Supp. 1454, 1458 (D.Or.1994). The analysis is similar whether or not the courts eventually find conflict. The *Moriarity* Court found no conflict, but only because it found "nothing in the SPD's language, structure or printed layout that could reasonably lead a participant" to believe something contradictory to the Plan Documents. *See Moriarity,* 158 F.3d at 161. The panel was explicit that "vested benefits" did not include disability benefits because "an average plan participant reading this SPD could not credibly come away believing that." *Id.* The *Adams* Court, in contrast, found conflict, but its analysis was almost identical when it ruled that "loss of hearing" in an SPD meant any loss of hearing despite the Plan Documents' limitation to "total and irrecoverable" loss of hearing. The judge noted that the SPD in that case limited the definition of "loss of sight" but not "loss of hearing," so employees could rely on the common definition of the second term. *See Adams,* 865 F.Supp. at 1458.

Even *Senkier,* which the Seventh Circuit claims to uphold in *Mers,* explicitly turned on the common meaning of a word. The *Senkier* Court found that the policy at issue could not cover a woman who died from a medical mishap during treatment for a chronic disease because the policy only covered death by "accident." Without explaining, the *Senkier* Court said in dicta that the definition of "accident" in the Plan Documents was a clarification of, not a conflict with the SPD. *See Senkier,* 948 F.2d at 1053. However, the decision actually turned on the finding that even the language of the SPD precluded payment of benefits. The SPD offered no coverage because a medical mishap fell outside the common meaning of "accident":

> A person can tell time without being able to define "time" and he can know how to ride a bicycle or shoot pool without being able to explain the principles of physics that enable him to do these things. He

---

**2.** Officially, the *Mers* Court did not overrule *Williams.* It said it was upholding earlier precedent, and it considered the *Williams* analysis to

"be a misstatement of our prior decision and not an overruling." *Mers,* 144 F.3d at 1022 n. 5.

can also classify a death as the consequence of illness or accident without being able to define either term.

*Id.* Thus, in testing for conflict, the *Senkier* Court gauged the difference between the common meaning of "accident" and the Plan Documents' definition of the term. *See id.* at 1052–53 (agreeing that courts could leave the question to "common understanding as revealed in common speech").

 With this in mind, this Court rejects the *Mers* analysis and finds that conflict can exist where an SPD uses a term having a common meaning and the Plan Documents then define it more restrictively. Conflict does not exist automatically. It will exist only where the common meaning of the term conflicts with the definition in the Plan Documents.

There would be no conflict where a word has no common meaning or where it would be unreasonable for a plan member to rely thereon. That would include where an SPD explicitly refers to a definition in the Plan Documents, for example, by noting that the specific term was used as defined by the Plan Documents.

 However, an insurance company cannot invalidate the entire SPD with a blanket disclaimer that the Plan Documents control in case of a conflict. That would make the SPD no longer "sufficiently accurate" under 29 U.S.C. § 1022(a). This Court recognizes that writing an accurate SPD understandable to the average plan member may be a daunting drafting challenge. But Congress did not order SPDs be written so that they could be read only by lawyers. Congress required that the SPD be "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). For an example of this failure, this Court need look no further than the CSC Summary in which defendants actually wrote that:

> "in an instance of conflict between this handbook and the applicable policy or plan, the plan of benefits, plan documents and the various policy provisions will govern."

(*See* Reply of the D.s to Pl.'s Mem. of Law in Supp. of Objection to D.s' Mot. For Summ. J. at 4 (quoting Exhibit "B" to D.'s Mot. For Summ J).) In this, defendants misquote the law to CSC employees and attempt to strip the CSC Summary of any legal significance. That attempt at legalese is exactly what Congress wanted to avoid, and thus, where employers or insurers make miscalculations in their language, they bear the risk.

B. *Applying to the Facts of this Case*

 In this case, the CSC Summary contained language that:

> "[i]n the event you are partially disabled you are eligible to receive benefits to assist your return to your previous profession ... [Following] a period for which you received Total Disability ... benefits, you will receive a Partial Disability benefit for each month that you are partially disabled."

(CSC Summary at 7–3) (attached as Exhibit E to Aff. of Barbara Mattias). Partial disability has a common meaning to the "average plan participant" contemplated by 29 U.S.C. § 1022(a)(1). A partial disability is an incapacitating condition that keeps an employee out of his or her job, but does not keep the employee from working entirely. The later condition would be a total disability.

Although Congress obviously did not expect plan participants to heft a shelf of dictionaries to define words in the SPD, it is worth noting that this common definition is consistent with accepted bibliographic ones. *See Webster's Third Int'l Dictionary* 1646 (1993) (partial disability is "a condition constituting less than total disability: incapacity preventing full performance of duties of an occupation as a result of accident or injury"); Richard Sloane, The *Sloane–Dorland Annotated Medical–Legal Dictionay* 176 (Supp.1992) (contrasting "permanent partial disability" with "permanent total disability").

This common meaning of partial disability conflicts with the CDC Plan's definition that requires the employee to go back to his or her former position at less than full time. Therefore, the CDC Summary's terms control here. Plaintiff's doctors have found that plaintiff suffers a partial disability, specifically a 5% permanent partial impairment of the

whole person or 7% permanent partial physical impairment of the lumbar spine.

As noted above, the global disclaimer that defendants attempted to insert into the CSC Summary is ineffective. Therefore, plaintiff is entitled to "a Partial Disability benefit for each month that" she is partially disabled without the necessity of returning to her prior employment on a part time basis.

There are material disputes as to the extent of plaintiff's partial disability and how to calculate the benefits plaintiff deserves. Therefore, summary judgment is inappropriate on the issue of the amount of benefits. That matter will be resolved at a bench trial.

### CONCLUSION

For the preceding reasons, defendants' motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted as to liability only.

It is so Ordered.