**Kathleen C. GRADY, Plaintiff,**

**v.**

**The PAUL REVERE LIFE INSURANCE COMPANY, Defendant.**

**No. 96–604L.**

United States District Court, D. Rhode Island.

June 1, 1998.

---

Christopher J. Behan, City Solicitor's Office, Newport, RI, for Plaintiff.

Jeffrey C. Schreck, Brown, Rudnick, Freed & Gesmer, Providence, RI, for Defendant.

### OPINION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court for decision following a nonjury trial. The case draws the Court into the world of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and requires the resolution of several issues which currently divide the federal courts.

The context is the claim of Katherine C. Grady ("plaintiff") for long-term disability benefits under a group policy (the "Policy") issued by The Paul Revere Life Insurance Company ("defendant") to plaintiff's employer, Academic Enterprises, Inc., d/b/a The Sawyer Schools ("Sawyer" or "The Sawyer Schools"), for the benefit of Sawyer employees.[1]

Plaintiff contends that defendant wrongly denied her claim, and seeks to recover the benefits she claims are due to her under the Policy. For the reasons that follow, the Court finds in favor of plaintiff.

### I.  Background

The following facts are undisputed. Plaintiff is married and has one child. She is a high school graduate and has earned all but three credits toward an associates degree in business management. In August 1986, she began working at The Sawyer Schools. Headquartered in Pawtucket, Rhode Island, The Sawyer Schools provide education programs in specialized fields at 6 locations in Rhode Island and 3 locations in Connecticut. Plaintiff started out at Sawyer as an Admission Representative, and in 1989 was promoted to Director of Admissions for the Rhode Island schools. In 1992 she was also made responsible for the Connecticut schools.

As Director of Admissions, plaintiff was responsible for managing all student recruitment in her assigned territory. She reported to Michael Kelly and John Crowley, then the owner and president, respectively, of Sawyer. Her duties included training and supervising fifteen admissions representatives at the various Sawyer locations. This mainly consisted of monitoring the representatives' success in meeting sales goals and objectives. Admissions representatives were given "leads," *i.e.*, potentially interested students, and were expected to convert a certain percentage of these leads into "starts," *i.e.*, actual enrolled students. Plaintiff was re-

---

1.  The Policy is Paul Revere Life Insurance Company Group Policy Number G–20611, held by Academic Enterprises, Inc., d/b/a The Sawyer Schools, Effective Date April 1, 1990.

sponsible for evaluating representatives and assessing the causes of, and solutions to, subpar performances. In addition, the training component of her duties was significant due to the considerable turnover among admissions representatives.

Plaintiff was also responsible for arranging advertising and determining the effectiveness thereof by evaluating the sales response in a given target market. In addition, she was responsible for ensuring that school facilities were prepared for class starts, which occurred every six weeks. Plaintiff also frequently delivered books and equipment to and from the various Sawyer locations.

The nature of plaintiff's duties required constant travel from her office in Newport, Rhode Island, to the various Sawyer locations, and to meetings in various locations regarding advertising. She also traveled approximately once per week to the Pawtucket headquarters to discuss enrollment numbers with Kelly and Crowley.

Plaintiff was never warned or disciplined while employed at Sawyer. She was promoted and received regular pay increases and bonuses. As of January 1995, she received a salary of approximately $45,160 per year, as well as family health insurance benefits and a company vehicle.

In December 1991, plaintiff began to experience back pain. On December 20 of that year she sought treatment with Dr. James Gloor, a general practitioner, at the Newport County Medical Treatment Office, Inc. Her condition gradually improved until July 1992, when the pain returned. Plaintiff then returned to Dr. Gloor, and continued to see him as her back pain became more severe and more frequent.[2] Dr. Gloor at times referred her to Dr. James O. Maher, an orthopaedic specialist.

In 1994, plaintiff's back pain grew worse and became constant. She also began to experience pain in her knees. She continued to treat with Dr. Gloor and Dr. Maher, and

the latter referred her to Dr. Edward V. Reardon, a specialist in rheumatology who first treated plaintiff on August 8, 1994.[3] Despite taking prescribed anti-inflammatory and narcotic pain killers on a daily basis, plaintiff's back and knee pain worsened.

In the fall of 1994, plaintiff's job performance began to suffer, and enrollment in the Connecticut locations, which had been rising under her supervision, began to fall. On January 17, 1995, Sawyer transferred responsibility for the Connecticut locations from plaintiff to another Sawyer employee. On January 20, 1995, plaintiff was placed on a medical leave of absence, with full pay and benefits. She remained on medical leave until April 1995, when her employment was terminated, with severance pay and benefits to continue through September 1995. She has not worked since that time.

Plaintiff then applied for state-provided disability benefits ("TDI"), and for long-term disability benefits under the Policy. The Policy provides benefits for: (1) total disability from any occupation; (2) total disability from the employee's own occupation; and (3) residual disability. The Policy states, "[t]he definitions of these terms follow. One or more may apply to the employee." The relevant Policy term for purposes of the present case is "totally disabled from the employee's own occupation or total disability from the employee's own occupation," which is defined as:

1.  because of injury or sickness, the employee cannot perform the important duties of his own occupation; and

2.  the employee is under the regular care of a doctor; and

3.  the employee does not work at all.

"Sickness" is defined as "an illness or disease." While the central issue in this case is whether the Policy definition of disability is satisfied, other Policy terms are involved.

2.  Starting in May 1992, Dr. Gloor also treated plaintiff on an ongoing basis for situational stress, anxiety and depression through the use of prescribed medications. Plaintiff related the stress to family problems, namely her husband's unemployment, and to job stress. Dr. Gloor

treated plaintiff for these conditions through March 1997.

3.  Rheumatology is the diagnosis and conservative treatment of people with musculoskeletal conditions.

Coverage is provided to two classes of employees: (1) Class 1, defined as "All Employees except Maintenance," and (2) Class 2, defined as "All Maintenance Employees." Plaintiff is a Class 1 employee.

With respect to eligibility for insurance, the Policy states:

An employee is eligible for insurance if he is a member of an eligible class . . . . No employee is eligible who:

1. is scheduled to work less than six months in any twelve month period; or
2. works less than the required number of hours as defined in the definition of "Full–Time".

"Full–Time," in turn, is defined in relevant part as "a work week of at least thirty hours."

The Policy provides for an "elimination period", defined as "the length of time that the employee must wait before benefits begin. . . .During the elimination period, the employee must be totally disabled from his own occupation." The elimination period is set, elsewhere in the Policy, at 180 days.

Coverage under the Policy automatically terminates on the earlier of several alternative events; the potentially relevant ones here are "the date [the employee] no longer works in an eligible class," and "the date he no longer works for the employer."

Finally, the Policy provides that "for any disability which is caused or contributed to by a psychiatric disorder . . . benefits are payable only while the employee is hospital confined, and for up to three months after the date the employee is no longer hospital confined." "Psychiatric disorder" is defined as "neurosis, psychoneurosis, psychopathy or psychosis."

Defendant received plaintiff's application for benefits on September 6, 1995, and by correspondence dated September 21, 1995, defendant denied the claim. The reason given for the denial was that plaintiff was not covered by the Policy on the date of her

disability; Dr. Reardon, on the Attending Physician Statement portion of plaintiff's application, had listed July 11, 1995 as the date of disability, while plaintiff's coverage had ceased on January 20, 1995 (the date plaintiff went on medical leave).[4]

On December 8, 1995, plaintiff appealed the denial of her claim, and thereafter submitted medical records from Dr. Reardon, Dr. Gloor and Dr. Maher. Among these records was a letter from Dr. Reardon stating that the July, 11, 1995 date of disability had been used inadvertently, and that plaintiff was actually disabled sometime between August 8, 1994, and January 20, 1995.[5] By correspondence dated March 13, 1996 and signed by Ann Lorraine Beane ("Beane"), a Group Disability Claim Examiner, defendant denied plaintiff's appeal. That correspondence states, in relevant part:

It appears that Ms. Grady did not keep an appointment she had with Dr. Reardon on December 13, 1994. She did, however, go to the Newport Treatment Office on December 29, 1995 to renew her medications. It was noted on her record that she was "doing well."

Ms. Grady's next date of treatment with Dr. Reardon was April 18, 1995. Her absence of treatment with Dr. Reardon from November 1994 to April 1995 is not consistent with a major medical problem compelling her to leave work.

According to Dr. Reardon's letter of December 12, 1995, Ms. Grady took a leave of absence on January 20, 1995 from her employment. This leave was requested by her employer. She did not leave work upon specific medical recommendation from her physician.

There is no supporting medical documentation that Ms. Grady suffered from a level of impairment on January 20, 1995 that would have precluded her from performing the duties of her own occupation as Director of Admissions. She was,

4. Plaintiff contends that coverage continued while she was on medical leave. As shall become clear, this dispute need not be resolved at this time.

5. Dr. Reardon stated that he used the July, 11, 1995 date "for TDI purposes only".

therefore, not considered totally disabled at that time.

On September 27, 1996, plaintiff filed a Complaint in Newport County Superior Court claiming that defendant wrongly denied her the benefits to which she was entitled under the Policy.[6] Plaintiff sought the following relief: (1) a declaration that she was totally disabled under the terms of the Policy on January 20, 1995, and remains so, and is thus entitled to the payment of disability benefits under the Policy through the present and into the future subject to the terms and provisions of the Policy; (2) an award of the amounts of such benefits, with interest; and (3) costs and attorney's fees.

On October 21, 1996, defendant filed a Notice of Removal to this Court, and on November 26, 1996 answered the Complaint. Defendant denies that plaintiff was disabled under the terms of the Policy on the relevant dates as established thereby, and thus contends that there is no basis for relief.

This Court conducted a nonjury trial of plaintiff's claim on September 8–10, 1997. The witnesses were: (1) plaintiff; (2) Leah McGowan, a Sawyer employee; (3) Dr. Reardon (by deposition); (4) John Crowley, President of Sawyer during the relevant time periods; (5) Jamie Harrower, Senior Vice President of Sawyer; (6) Paul Kelly, who assisted Crowley and then became President of Sawyer beginning in late 1995; (7) Ann Lorraine Beane, defendant's Group Disability Claims Examiner; (8) Dr. Marvin Goldstein, defendant's Associate Medical Director; and (9) Dr. Gloor (by deposition). Both parties also entered exhibits.

Following the presentation of evidence, the Court took the matter under advisement, and the parties submitted memoranda summarizing their evidence and arguments. The Court has considered the issues in this case, and the matter is now in order for decision. Pursuant to Fed.R.Civ.P. 52, the following are the Court's findings of fact and conclusions of law.

## II. Standard of Review

A critical threshold issue, disputed in this case, is the proper standard by which this Court should review defendant's denial of plaintiff's claim for benefits. The parties agree that, as a claim for benefits under an employer-provided plan, this case is governed by ERISA.

However, ERISA itself does not mandate a standard of review in cases such as this. Prior to ERISA, such claims were treated as follows:

> If the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112–13, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). With the passage of ERISA, however, courts came to review these cases under the highly deferent "arbitrary and capricious" standard, in which the administrator's decision was to be upheld as long as it was " 'rational in light of the plan's provision', as well as, reasonable with no abuse of discretion." *Coleman v. Metropolitan Life Ins. Co.,* 919 F.Supp. 573, 581 (D.R.I.1996) (quoting *Perry v. United Food and Commercial Workers District Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir.1995)).

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court considered the

---

**6.** While the Complaint does not state specific causes of action, plaintiff proceeds under 29 U.S.C. § 1132(a)(1)(B), which states: "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."

Plaintiff also contends that defendant failed to satisfy the requirements of 29 U.S.C. § 1133, which requires employee benefit plans to provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

proper standard of review of ERISA benefits-claim denials challenged under 29 U.S.C. § 1132(a)(1)(B). The Court rejected the uniform application of the arbitrary and capricious standard to such cases. Rather, the Court held that "[c]onsistent with established principles of trust law ... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948.

The Court found that "ERISA abounds with the language and terminology of trust law." *Id.* at 110, 109 S.Ct. 948. Under trust law principles, "a deferential standard of review [is] appropriate when a trustee exercises discretionary powers." *Id.* at 111, 109 S.Ct. 948. Otherwise, however, "courts construe terms in trust agreements without deferring to either party's interpretation." *Id.* at 112, 109 S.Ct. 948. The Court explained that this *de novo* treatment of trust disputes in the absence of discretionary powers was consistent with the treatment of ERISA-type claims prior to the enactment of ERISA, as noted *supra. Id.* at 112, 109 S.Ct. 948.

The Court also reasoned that this approach suited Congress' intent in enacting ERISA, which was " 'to promote the interests of employees and their beneficiaries in employee benefit plans.' " *Id.* at 113–14, 109 S.Ct. 948 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Automatically applying the arbitrary and capricious standard to § 1132(a)(1)(B) actions, without regard to the presence or absence of discretionary authority in the trustee, would afford employees less protection than they had before ERISA. *Id.* Thus, such an approach would violate Congress' intent.[7]

Finally, the Court rejected the argument that *de novo* review would contravene the spirit of ERISA by "impos[ing] much higher administrative and litigation costs and therefore discourag[ing] employers from creating benefit plans." *Id.* at 114, 109 S.Ct. 948. Rather, benefit plans could simply avoid *de novo* review by conferring discretionary authority upon plan administrators; in any event, "the threat of increased litigation is not sufficient to outweigh the reasons for a *de novo* standard ...." *Id.* at 115, 109 S.Ct. 948.

Thus, *Firestone* establishes a clear approach to § 1132(a)(1)(B) challenges to benefit denials based on the interpretation of plan terms. In the present case, however, the ultimate question before this Court is not one of plan interpretation; there is no dispute as to the meaning of the relevant Policy terms. Rather, the question is one of fact: was plaintiff disabled, as defined by the Policy, on a date when covered by the Policy?

For purposes of determining the standard of review in this case, then, the critical questions are these: does the *Firestone* holding extend to § 1132(a)(1)(B) cases challenging benefit denials based on *factual* determinations? If not, then what is the proper standard of review in such cases?

Essentially, there are three possible approaches. The first is that *Firestone* applies; if the plan confers discretionary authority upon the administrator, then the district court is to apply the arbitrary and capricious standard of review to the administrator's factual determinations. If the plan does not confer such authority, then review is *de novo*. The second possibility is that, regardless of whether the plan confers discretionary authority, arbitrary and capricious review of factual determinations is always proper. Similarly, the third possibility is that, regardless of whether the plan confers discretionary authority, *de novo* review of factual determinations is always proper.

This riddle has produced a sharp split among the federal courts. To date, the First Circuit has not squarely addressed the issue. In *Recupero v. New England Telephone and Telegraph Co.,* 118 F.3d 820, 827–28 (1st Cir.1997), the First Circuit held that where a plan confers discretionary authority under

---

7. The Court's reading of Congress' intent was unaffected by the demise of an amendment to § 1132 providing for *de novo* review of benefit denials. The Court rejected the interpretation of this "event" as Congress' expression of a desire for the uniform application of the arbitrary and capricious standard.

*Firestone*, federal jurisdiction is grounded in judicial review, and therefore district courts do not have plenary authority to decide claims anew on the merits. In that case, the subject plan conferred discretionary authority. *Id.* at 827. Nevertheless, the parties asked the First Circuit to "decide this controversy finally, or order the district court to do so, making any factual findings necessary to a decision on the merits. . . ." *Id.* at 823.

In finding that the district court did not have jurisdiction to do so, the Court did not question "First Circuit decisions that recognize the authority of the court to be less deferential, or not deferential at all, of out-of-court decisions by fiduciaries to whom a benefit plan did *not* grant discretionary authority to decide the matter at issue." *Id.* at 828. However, the Court stated that "the role of the courts with respect to . . . claims under an employee benefits plan is jurisdictionally limited to review, *if a plan administrator or fiduciary was given discretion to decide particular claims. . . .*" *Id.* at 837 (emphasis added).

Whatever the implications of *Recupero*, it does not squarely address the question before this Court. Indeed, *Recupero* did not overrule, or even mention, cases in which district courts within the First Circuit concluded that the *Firestone* holding applied to fact-based ERISA benefit denials. *See Cleary v. Knapp Shoes, Inc.*, 924 F.Supp. 309, 313 n. 5 (D.Mass.1996); *Jorstad v. Connecticut General Life Ins. Co.*, 844 F.Supp. 46, 54 (D.Mass.1994); *see also McLaughlin v. Reynolds*, 886 F.Supp. 902, 905–06 (D.Me. 1995). Thus, a survey of the cases in this area is necessary.

The Third, Sixth and Seventh Circuits have all held that *Firestone* does apply to fact-based ERISA benefit denials challenged under § 1132(a)(1)(B). *See Rowan v. Unum Life Ins. Co. of America*, 119 F.3d 433 (6th Cir.1997); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir.1994); *Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176 (3d Cir.1991).

The Third Circuit analyzed this issue extensively in *Luby*. In that case, the Court found that the split on the issue was due largely to varying interpretations of the *Firestone* holding. *Luby*, 944 F.2d at 1182.

Early in its opinion, the Supreme Court noted that "[t]he discussion which follows *is limited to* the appropriate standard of review in § 1132(a)(1)(B) actions challenging denial of benefits *based on plan interpretations.*" (emphasis added). The problem however is that the Court's later holding is not expressly limited: "we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority *to determine eligibility for benefits or to construe the terms of the plan.*" (emphasis added).

*Id.* at 1182 (internal citations omitted). The Court agreed with *dictum* from a Seventh Circuit opinion, stating that *Firestone*

strongly suggests that the Court intended *de novo* review to be mandatory where administrators were not granted discretion, regardless of whether the denials under review were based on plan interpretations. If this were not the intent, the Court could simply have omitted the words "to determine eligibility for benefits," from the above-quoted holding and confined the "unless" clause to "unless the benefit plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan."

*Id.* at 1183 (quoting *Petrilli v. Drechsel*, 910 F.2d 1441, 1446 (7th Cir.1990)). The Third Circuit found further that the limitation clause in the *Firestone* holding was "intended to distinguish between remedial actions challenging claim denials brought under 29 U.S.C. § 1132(a)(1)(B) and remedial actions based on or brought under *other* ERISA provisions." *Id.*

Beyond the language of the *Firestone* holding, the Third Circuit rejected the argument that courts should defer to plan administrators as a matter of policy.

Plan administrators are not governmental agencies who are frequently granted deferential review because of their acknowledged expertise. Administrators may be laypersons appointed under the plan, sometimes without any legal, accounting,

or other training preparing them for their responsible position, often without any experience in or understanding of the complex problems arising under ERISA .... *Id.* at 1183. Finally, with respect to ERISA's purpose of protecting the interests of plan members and their beneficiaries, the Third Circuit stated, "[w]e believe these interests are better served when plan administrator's [sic] factual determinations are accorded no deference, but subject to *de novo* review." *Id.* at 1184.

Similarly, in *Donato,* 19 F.3d at 379 n. 2, the Seventh Circuit confirmed its suggestion in *Petrilli v. Drechsel, supra,* that *Firestone* applies to challenges of benefit denials under 29 U.S.C. § 1132(a)(1)(B) regardless of whether the denials are based on factual determinations or interpretations of plan terms.

In reaching the same result, the Sixth Circuit has held that there is simply no reason to defer to administrators who have not been given discretion, because, unlike administrative bodies or district courts, whose factual determinations are generally accorded deference, " 'one party to a contract has an incentive to find facts not in a neutral fashion, but in the manner that is most advantageous to its own interests.' " *Rowan,* 119 F.3d at 436 (quoting *Perez v. Aetna Life Ins. Co.,* 96 F.3d 813, 824 (6th Cir.1996), *vacated for reh'g en banc,* 106 F.3d 146 (6th Cir. 1997)).[8] To defer in such circumstances, the Court concluded, would afford less protection to employees than they enjoyed before ERISA. *Id.*

8. In *Perez,* the Court concluded that *Firestone* applied to fact-based ERISA benefit denials, but then vacated its panel opinion and voted to rehear the case en banc. Subsequently, a Sixth Circuit panel issued the opinion in *Rowan.*

9. *Restatement (Second) of Trusts* (1959) § 186(b) states: "the trustee can properly exercise such powers and only such powers as ... are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust."

10. In *DeFelice,* the dispute centered upon the factual question of whether the death of plaintiff-appellee's husband was "accidental," *i.e.,* whether he died by choking or from a heart attack. *Id.* at 63–64. The parties agreed with, and the Second Circuit did not question, the district court's conclusion that *Firestone* "mandates *de novo* re-

The Sixth Circuit further held that while *Restatement (Second) of Trusts* § 186(b)(1959) provides that trustees (and therefore, under *Firestone,* plan administrators) have the power to do what is "necessary or appropriate" to administer the trust,[9] this power does not inherently include discretion to decide factual issues. *Id.* Finally, the Court, following the Supreme Court's reasoning in *Firestone,* dismissed concerns that reviewing factual determinations *de novo* would cause a flood of litigation; rather, plans need only confer discretionary authority upon administrators to avoid *de novo* review. *Id.*

The Second and Fourth Circuits have also implicitly approved the application of *Firestone* to fact-based ERISA benefit denials. *See DeFelice v. American Int'l Life Assurance Co. of New York,* 112 F.3d 61 (2d Cir. 1997); *Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017 (4th Cir.1993). The courts in both cases, in considering the *scope* of *de novo* review, have not questioned that *de novo* review in fact applied.[10] *Id.*

In addition, the Eleventh Circuit appears to endorse the application of *Firestone* to fact-based ERISA benefit denials. *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446 (11th Cir.1997). That Court recently stated, "we conclude that the 'arbitrary and capricious' standard of review is the appropriate standard by which to evaluate a plan administrator's factual findings in cases involving the denial of benefits under ERISA." *Id.* at 1447. However, the Court later stated:

view of the ... denial of benefits." 112 F.3d at 65.

Similarly, *Quesinberry* involved a dispute over the cause of an insured's death. 987 F.2d at 1020. The Fourth Circuit stated:

We note that the standard of review in this case is, as it was in *Firestone,* concededly one of *de novo.* We do not address here the situation where the plan or trust instrument reserves to the administrator or fiduciary discretionary powers. In such cases, "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion."

*Id.* at 1022 n. 3 (internal citation omitted).

[O]ur court has interpreted the Supreme Court's analytical framework in *Firestone* ... to mean that, *where an ERISA plan grants discretion to a plan administrator to interpret the express terms of the plan or to determine eligibility for benefits,* we review both the administrator's construction of the plan and concomitant factual findings with respect to each case under an arbitrary and capricious standard of review.

*Id.* at 1451 (emphasis added). That case was one in which the plan conferred discretionary authority upon the administrator. *Id.* at 1450. The Court concluded that

> *where an ERISA-governed plan confers discretion on an administrator to interpret plan terms and decide eligibility for benefits,* we review the administrator's fact-based conclusions regarding eligibility to determine whether these conclusions are arbitrary or capricious ....

*Id.* at 1452 (emphasis added). Thus, while the Court did not establish the proper standard of review where a plan does *not* confer discretionary authority upon the administrator, its citation of *Firestone* appears to endorse the application of that case to fact-based ERISA denials generally.[11]

The primary opposition to applying *Firestone* to fact-based ERISA benefit denials comes from the Fifth Circuit. *See Pierre v. Connecticut General Life Ins. Co./Life Ins. Co. of North America,* 932 F.2d 1552 (5th Cir.1991). In *Pierre,* the Court found that *Firestone* did not automatically apply in such cases, because the Supreme Court expressly limited its holding to " 'the appropriate standard of review in § 1132(a)(B)(1)[sic] actions challenging denials of benefits based on plan

*term* interpretations.' " *Id.* at 1556–57 (quoting *Firestone,* 489 U.S. at 108, 109 S.Ct. 948).

The Court then concluded that *Restatement (Second) of Trusts* § 186(b), read together with provisions of ERISA itself, mandated that a plan administrator's inherent discretion "includes passing on issues of fact that determine individual eligibility for benefits."[12] *Id.* at 1557–58. As a result, the *Firestone* determination of whether a plan confers discretionary authority upon the administrator is unnecessary in reviewing factual determinations, because the administrator *inherently* enjoys such authority. *Id.*

The Fifth Circuit further explained that unlike plan term interpretations, which are contractual in nature, "[i]n virtually all decisional review, some deference is given to the fact finder, whether it is a district court giving deference to an administrative body, or an appellate court giving deference to the district court." *Id.* at 1559. Therefore, the Supreme Court's concerns about not lessening employee protections after ERISA did not apply. *Id.* at 1558–59. Finally, the Court warned that applying *Firestone* to fact-based ERISA benefit denials could increase litigation and improperly inject the courts into benefits determinations; "[t]he courts simply cannot supplant plan administrators, through *de novo* review, as resolvers of mundane and routine fact disputes." *Id.* at 1559. Thus, the Fifth Circuit concluded, "under the principles of trust law, we owe the administrator's factual determination a deferential review."[13] *Id.* at 1558.

The Eighth Circuit, in *Cox v. Mid–America Dairymen, Inc.,* 965 F.2d 569, 571 n. 2 (8th Cir.1992), stated in *dicta* that "[o]ur circuit has apparently sided with those adopt-

---

**11.** *Paramore* did not mention *Moon v. American Home Assurance Co.,* 888 F.2d 86 (11th Cir. 1989). In that case, the Eleventh Circuit found *de novo* review proper under *Firestone* where the issue was whether, when the insured was killed, he was (1) an officer of the company; and (2) on company business. *Id.* at 89.

**12.** *Restatement (Second) of Trusts* § 186(b), is the "necessary or appropriate" provision discussed in *Rowan, supra.*
　As for ERISA, the Fifth Circuit stated:
　[A]n ERISA trustee, by its very nature, is granted some inherent discretion, *i.e.,* "authority to control and manage the operation and admin-

istration of the plan." 29 U.S.C. § 1102(a)(1); furthermore, he is required to provide "a full and fair review" of each claim denial. [sic] *Id.* at 1558.

**13.** While declaring "deferential review" appropriate, the Fifth Circuit did not adopt the arbitrary and capricious standard. Instead, "the abuse of discretion standard of review is the appropriate standard; that is, federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment." *Id.* at 1562.

ing the deferential standard of review." However, one year later, the Eighth Circuit affirmed the district court's *de novo* review, pursuant to *Firestone,* of an administrator's decision on an arguably factual issue, *i.e.,* whether or not the insured was sane at the time of his suicide. *Donatelli v. Home Ins. Co.,* 992 F.2d 763, 765 (8th Cir.1993). *See also Equitable Life Assurance Society of the United States v. Crysler,* 66 F.3d 944, 949 (8th Cir.1995) ("In reviewing a plan administrator's benefits decision, a threshold question is whether the plan gives the decisionmaker discretionary authority to rule on benefit claims. *If it does,* then the plan administrator or insurer must make the initial decision, which the Court then reviews under a deferential standard of review.") (emphasis added).

As noted *supra,* the First Circuit has not squarely addressed this conundrum. Nevertheless, several district courts within the First Circuit have concluded that the *Firestone* holding applies to fact-based ERISA benefit denials. *See Cleary v. Knapp Shoes, Inc.,* 924 F.Supp. 309, 313 n. 5 (D.Mass.1996) (rejecting *Pierre,* and reviewing administrator's factual determinations *de novo* where the plan did not confer discretionary authority); *Jorstad v. Connecticut General Life Ins. Co.,* 844 F.Supp. 46, 54 (D.Mass.1994) (same); *see also McLaughlin v. Reynolds,* 886 F.Supp. 902, 905–06 (D.Me.1995) (reviewing administrator's factual determination *de novo* ).[14]

This Court agrees with the district courts in the First Circuit, and with those circuit courts which have concluded that *Firestone* applies to fact-based ERISA benefit denials challenged under 29 U.S.C. § 1132(a)(1)(B).

As the Third Circuit noted in *Luby,* the Supreme Court's limitation of its holding in *Firestone* to "the appropriate standard of review in § 1132(a)(1)(B) actions challenging denial of benefits based on plan interpretations" appears intended to distinguish § 1132(a)(1)(B) actions from those under other ERISA provisions. *See* 944 F.2d at 1183. The lack of any such limitation in the subsequent statement of the holding suggests that the Supreme Court did not intend for a

separate rule to govern *fact*-based § 1132(a)(1)(B) cases, as distinct from *term*-based cases. *See Donato,* 19 F.3d at 379 n. 2; *Luby,* 944 F.2d at 1183.

Indeed, there is little basis for a separate rule. The *Firestone* rule properly conditions the nature of review on the nature of the particular ERISA plan, reflecting the contractual character of such plans. If the parties to a plan agree that the administrator will have discretionary authority, then judicial deference is appropriate. In the absence of such an agreement, however, no such deference is warranted. Nothing about factual determinations counsels a different result. Courts did not automatically defer prior to ERISA, and to do so now would only lessen the protection that employees previously enjoyed. *See Firestone,* 489 U.S. at 112–14, 109 S.Ct. 948; *Rowan,* 119 F.3d at 436.

Moreover, the factors counseling deference by district courts to administrative agencies, and by appellate courts to district courts, are simply not present here. *See Rowan,* 119 F.3d at 436; *Luby,* 944 F.2d at 1183. Plan administrators are not necessarily experts, and are not presumptively neutral. *Id.* Indeed, in cases such as the present one, where the party making factual determinations is the same party which will pay the benefit claim out of its own funds if the claim is granted, there is little to suggest neutrality. *See Rowan,* 119 F.3d at 436. "The basis for the deferential standard of review in the first place was the trust nature of most ERISA plans. The insurance company here could hardly be regarded as a trustee for an insured." *Moon v. American Home Assurance Co.,* 888 F.2d 86, 89 (11th Cir.1989). Thus, there is no reason to defer in these circumstances.

In addition, the Supreme Court's reasoning in *Firestone,* regarding the possibility that *de novo* review will result in a flood of litigation, is equally applicable here; benefit plans can avoid *de novo* review of factual determinations simply by conferring discretionary authority upon administrators. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Rowan,* 119 F.3d at 436.

---

**14.** The First Circuit did not overrule, or even        cite, these cases in *Recupero,* 118 F.3d 820.

Finally, this Court disagrees with the Fifth Circuit's finding that ERISA plan administrators enjoy inherent discretion to make factual determinations. *See Rowan*, 119 F.3d at 436. *Firestone* clearly precludes reliance on *Restatement (Second) of Trusts* § 186(b) as a source of inherent discretion to interpret plan terms, and § 186(b) makes no distinction between plan interpretations and factual determinations. *Id.* Furthermore, while ERISA grants the plan administrator the authority to control and manage the plan, as well as the obligation to provide a full and fair review of each claim denial, there is a fundamental difference between these administrative functions and inherent discretion to make factual determinations. The administrator's powers simply do not extend as far as such inherent discretion.

■ Thus, for purposes of badly-needed clarity, the rule is this: where an ERISA plan confers discretionary authority upon the administrator to determine eligibility for benefits or to construe the terms of the plan, then the district court is to apply the arbitrary and capricious standard of review to the administrator's factual determinations. If the plan does not confer such authority, then review is *de novo*.

■ The question, then, is whether the Policy confers discretionary authority upon Paul Revere to determine eligibility for benefits or to construe the terms of the plan. The First Circuit has established that such authority must be found in clear plan language. *Allen v. Adage, Inc.*, 967 F.2d 695, 697–98 (1st Cir.1992) (*de novo* review appropriate where "nothing in the Plan indicates that another approach is to be used."); *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 29 (1st Cir.1991) (*de novo* review appropriate where defendant "points to no language in the Plan giving it the 'discretionary authority' required...."); *Cleary v. Knapp Shoes, Inc.*, 924 F.Supp. 309, 313 (D.Mass.1996) (same; specifically, proof of loss requirement insufficient).

[I]n order for the more deferential arbitrary and capricious standard to apply ...

"discretionary authority" as defined by *Firestone* must be expressly conferred by the plan in question. A finding of this express authority does not hinge on a policy's use of any magic words such as 'discretion.' The policy must, however, set forth terms sufficient such that it can reasonably be found that such power and discretion has been conferred.

*Coleman v. Metropolitan Life Ins. Co.*, 919 F.Supp. 573, 580 (D.R.I.1996) (internal citations omitted). An example of such language is found in a plan giving the administrator the power " 'to interpret and construe the Plan, [and] to determine all questions of eligibility and the status and rights of the Participants' ", and providing that "all decisions of the administrator 'shall, to the extent not inconsistent with provisions of the Plan, be final and conclusive and binding upon all persons having an interest in the Plan.' " *Id.* (quoting *Block v. Pitney Bowes*, 952 F.2d 1450, 1452–53 (D.C.Cir.1992)).

In the present case, the Policy contains no language even approaching a grant of discretionary authority to defendant. Rather, defendant contends that such authority may be inferred from provisions in the Policy requiring claimants to submit proof of claim, proof of loss, and written proof of entitlement, as well as provisions providing defendant with the right to request additional information and to order an independent medical examination.

These provisions are flatly insufficient under *Firestone* and First Circuit precedents. *Allen*, 967 F.2d at 697–98; *Bellino*, 944 F.2d at 29; *Cleary*, 924 F.Supp. at 313; *Coleman*, 919 F.Supp. at 580. They are simply garden-variety contract terms specifying the procedure by which claims are to be processed, and by which the Policy is to be administered. It would require a logical leap of Olympic proportions to find that these provisions give defendant the last word in interpreting the contract, or in determining eligibility for benefits. While a benefit plan undoubtedly may do so, the Policy undoubtedly did not.[15]

---

**15.** Defendant cites *Simms v. The Paul Revere Life Insurance Co.*, Civil Action No. 3:97cv70 (E.D.Va.

1997), a case finding that a Paul Revere policy, containing the same language as the present Pol-

Thus, this Court will review the factual determinations made by defendant in denying plaintiff's claim for benefits, *de novo.*

### III. Scope of *De Novo* Review

█ Another critical threshold issue dividing the federal courts is the proper scope of *de novo* review in § 1132(a)(1)(B) challenges. This problem boils down to whether courts should consider evidence beyond that which was before the plan administrator at the time of the challenged decision.

This is another issue presently unresolved by the First Circuit. *See Recupero,* 118 F.3d at 833 ("We have not decided, and need not decide today, whether a court, when reviewing a benefits determination, must restrict itself to the 'record' as considered by the decisionmaker who interpreted the employee benefits plan.") Again, a review of the cases is useful.

Three positions have emerged regarding this quandary. One, adopted by the Third and Eleventh Circuits, is that district courts are not limited to the record before the administrator in conducting *de novo* review. *Luby,* 944 F.2d at 1184–85; *Moon,* 888 F.2d at 89. These courts have reasoned that such a limitation, while sensible in the context of arbitrary and capricious review, would be contrary to the concept of *de novo* review. *Id.*

Another position, adopted in different formulae by the Second, Fourth, Eighth, and Ninth Circuits, is that district courts may take additional evidence beyond that considered by the administrator, but subject to limitations. *See DeFelice,* 112 F.3d at 66 ("the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought

not to be exercised in the absence of good cause."); *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943–44 (9th Cir.1995) (where record before administrator sufficiently developed, court should not take additional evidence); *Donatelli,* 992 F.2d at 765 (court should not admit additional evidence absent good cause); *Quesinberry,* 987 F.2d at 1025 (district court should exercise discretion to allow evidence not before administrator "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.")

These courts have attempted to strike a balance between the competing policies of protecting employees, on one hand, and providing prompt resolution of claims and avoiding excessive judicial involvement in plan administration, on the other. *Id.*

The final position, taken by the Sixth Circuit, is that district courts simply may not take evidence beyond that before the plan administrator. *See Perry v. Simplicity Engineering,* 900 F.2d 963, 966–67 (6th Cir. 1990). In *Perry,* the Sixth Circuit began by explaining that the term *"de novo"* refers "both to review of the decision below based only on the record below and to review based on the record below plus any additional evidence received by the reviewing court. The Supreme Court ... did not indicate which meaning it had in mind." *Id.* at 966 (internal citation omitted).

The Court continued,

[i]n the ERISA context, the role of the reviewing federal court is to determine whether the administrator or fiduciary made a correct decision, applying a *de novo* standard. Nothing in the legislative

icy, conferred discretionary authority upon the administrator. The Court in that case did not rely on express terms conferring such authority; there were none. Rather, the Court, relying on *Prince v. Hartford Life and Accident Ins. Co.,* 780 F.Supp. 1069 (E.D.Va.1991), pointed to federal regulations providing that an insurance company providing benefits under an employee-benefit plan was the "appropriate named fiduciary", responsible for hearing appeals from denied claims. As the "appropriate named fiduciary", the Court reasoned, Paul Revere had inherent discretion to make eligibility determinations.

Thus, it had discretionary authority under *Firestone.*

This Court respectfully disagrees with *Simms* and *Prince;* under the approach established in the First Circuit, discretionary authority must be found in clear plan language, not inferred from federal regulations. Under the *Simms* and *Prince* approach, there would be no need for an inquiry into discretionary authority to begin with, because every insurance company would be the "appropriate named fiduciary" and would thus have such authority.

history suggests that Congress intended that federal district courts would function as substitute plan administrators, a role they would inevitably assume if they received and considered evidence not presented to administrators concerning an employee's entitlement to benefits. Such a procedure would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme.

*Id.* The Court compared review under ERISA to review of federal magistrates' rulings on motions to suppress, which district courts consider on the evidentiary record before the magistrate. *Id.* Finally, the Court found that allowing additional evidence would undermine the protection of employees because it would clash with the "primary goal of ERISA ... to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Id.* at 967.

While the First Circuit has not resolved this issue, several district courts within the Circuit have considered it. *See Cleary,* 924 F.Supp. at 313–15 (allowing additional evidence where administrative record was "sparse" and causation issues were complex); *McLaughlin,* 886 F.Supp. at 906 (finding that while limited scope of review is appropriate under the arbitrary and capricious standard, it is "more appropriate" to allow additional evidence upon *de novo* review); *Jorstad,* 844 F.Supp. at 56 ("This court finds that the better approach is to permit a court the discretion to accept additional medical information when conducting *de novo* review but not when conducting review under a more deferential standard.").

This Court concludes that it is appropriate, when utilizing *de novo* review, to consider evidence not before the plan administrator. Limiting review to the record before the administrator would be an act of deference which, while appropriate under a deferent standard of review, is antithetical to the very concept of *de novo* review. *Luby,* 944 F.2d at 1184; *Moon,* 888 F.2d at 89; *McLaughlin,* 886 F.Supp. at 906; *Jorstad,* 844 F.Supp. at 56. Moreover, no such limitation existed prior to ERISA; thus, imposing one now would afford less protection to employees than they enjoyed previously. *See Firestone,* 489 U.S. at 113–14, 109 S.Ct. 948; *Moon,* 888 F.2d at 89.

This Court is not concerned that this approach will offend Congress' intent by precluding prompt claims resolution or turning federal courts into surrogate plan administrators. *See Perry,* 900 F.2d at 966–67. Benefit plans need only confer discretionary authority upon plan administrators to avoid *de novo* review. Moreover, had Congress intended to preclude full judicial review of benefit claim denials, it could have done so. It did not, and this Court finds no basis, absent a legislative command or an agreement by the parties, to alter the traditional scope of review.

As noted *supra,* plan administrators do not necessarily possess the characteristics of expertise and neutrality that warrant deference in other contexts. Indeed, even if this Court adopted the position that accepting additional evidence is appropriate only where there is "good cause" to do so, defendant's obvious conflict of interest in the present case offers precisely the type of "good cause" found by the Second Circuit in *DeFelice. See* 112 F.3d at 66.

> The policy expressed in *Perry* that district courts should not become "substitute plan administrators" is inappropriate where such a blatant conflict exists at the administrative level. In such circumstances, courts *must* exercise fully their power to review *de novo* and to *be* substitute administrators. Plaintiffs are utterly helpless against the whim of the conflicted body's interpretation of the facts. The normal scope of limited *"de novo"* review is inappropriate where the fairness of the ERISA appeals process cannot be established using only the record before the administrator.

*Id.*

Thus, this Court will not limit its review of defendant's decision denying plaintiff's claim for benefits to the record before defendant at the time of its decision.

## IV. Findings of Fact

The undisputed facts have been set forth *supra*, and are incorporated here by reference. It is clear to the Court that beginning at the end of 1991, plaintiff suffered great pain in the back and knees, which worsened steadily through 1994. Plaintiff testified credibly that by the fall of 1994 her pain was severe, but that she nevertheless continued to report to work because she could not afford to lose her job. Plaintiff had a young child, and her husband had not worked in several years. As the sole breadwinner in the family, plaintiff did everything she could to keep her job. By the end of 1994 her pain was "unbearable", and was especially aggravated by long periods of sitting, standing, driving, and walking. As a result, plaintiff was unable to maintain the regimen of extensive daily travel required by her work, and she began reporting to work late, leaving early, and on some days not reporting at all. The timing of the slipping performance of Sawyer's Connecticut schools, and the eventual removal of those schools from plaintiff's control, is consistent with the worsening of plaintiff's condition in late 1994.

In addition, while plaintiff did not request medical leave, and indeed while on leave told Crowley that she wished to return to work, it is clear from her personal circumstances that she felt she simply could not afford to lose her job. Indeed, Crowley testified that when he informed plaintiff that she would not be coming back to work from medical leave, plaintiff was upset because "the bills need to be paid".

Leah McGowan, a Sawyer employee who worked with plaintiff, offered her own observations as to plaintiff's condition in the fall of 1994. She testified that at that time plaintiff began to "slow down" in her travel and job performance. Plaintiff began to come in late, leave early, or not come in at all on a daily basis, maintaining contact with her office by telephone. In addition, McGowan observed that plaintiff had difficulty sitting behind a desk, and would occasionally be reduced to tears from pain.

While plaintiff's absences were not recorded in Sawyer's employee records, Sawyer Vice President Jamie Harrower testified that the company had no formal sick-time policy for employees of plaintiff's rank, and that only absences which were reported to the company would be recorded. Furthermore, plaintiff's office was not at the Pawtucket headquarters, and plaintiff only traveled to Pawtucket approximately once per week. Thus, the lack of awareness by Crowley or Paul Kelly of plaintiff's physical problems and declining work attendance is not particularly probative in light of their infrequent contact with her.

The medical evidence in this case confirms that plaintiff suffered from disabling back and knee problems. In December 1991, plaintiff first sought treatment from Dr. Gloor. She continued to see Dr. Gloor through 1994, by which time he was repeatedly administering injections of Toradol, an anti-inflammatory medication. In addition, Dr. Maher, an orthopaedic specialist, diagnosed plaintiff with lumbar strain on March 2, 1993, and in May of 1994 and labeled that condition chronic.

On August 9, 1994, plaintiff had her first visit with Dr. Reardon, who continues to treat her. Dr. Reardon is board-certified in internal medicine and rheumatology. He specializes in the latter, treating patients with back and/or knee problems on a daily basis. Dr. Reardon diagnosed plaintiff with back pain caused by lumbar disk disease, and arthritis with mechanical factors. He also diagnosed patellafemoral pain syndrome with respect to plaintiff's knee problems. He based his diagnosis on plaintiff's history, physical and lab studies, and some x-rays. Dr. Reardon's notes through March 11, 1997, establish that plaintiff's condition did not improve significantly through that time.

Dr. Reardon opined that the standard and most helpful treatment for plaintiff's condition would be rest, which would allow for some healing to occur. In treating plaintiff, Dr. Reardon has continuously prescribed various medications to help plaintiff relieve her pain. He has also continuously recommended that plaintiff perform swimming exercises, and undertake to lose weight. Nevertheless, Dr. Reardon maintains that rest is the only approach to plaintiff's problems that

will truly allow for any healing; indeed, any minor improvements in plaintiff's condition that Dr. Reardon notes in his records correspond to rest.

Dr. Reardon opined that, due to plaintiff's condition, she was disabled sometime between when he first saw her and January 20, 1995.[16] Dr. Reardon noted that plaintiff's pain was exacerbated by repeated transitions from the sitting to the standing position and from the standing to the sitting position, as well as walking and climbing stairs. Since these types of movement were both necessary and frequent in plaintiff's work, Dr. Reardon felt that plaintiff's continuing to work was aggravating her condition.

Dr. Reardon discussed with plaintiff the possibility of her leaving work during their first meeting on August 9, 1994, but plaintiff flatly refused to consider such an option due to her family's precarious financial situation. In addition, Dr. Reardon testified that plaintiff's condition did not necessarily worsen between August 8, 1994, and January 20, 1995; hence his opinion that she was disabled from the moment he saw her. He explained that while she had tremendous pain and was "qualified to be disabled", he felt she was, nevertheless, reporting to work out of fear of losing her job.

On October 18, 1996, Dr. Barbara Reiser performed an independent medical exam of plaintiff for social security purposes, and certified plaintiff as disabled as of January 20, 1995. Dr. Reiser diagnosed chronic lower back pain in the setting of degenerative joint disease and obesity, and bilateral knee pain consistent with patellafemoral syndrome. Dr. Reiser found plaintiff symptomatically limited due to pain as well as deconditioning, and found that plaintiff could not tolerate jobs requiring extensive standing, sitting or transfers, and that plaintiff should avoid jobs requiring extensive stair climbing, stooping, bending or climbing.

The only medical opinion to the contrary comes from Dr. Goldstein, a full-time employee of defendant who is board-certified in internal medicine with a sub-specialty in cardiovascular disease. Dr. Goldstein did not treat plaintiff, but reviewed the medical records plaintiff submitted in appealing the initial denial of her claim.[17]

Dr. Goldstein concluded that while plaintiff did suffer pain, her condition was common in the adult population, "particularly for someone of Mrs. Grady's weight." Dr. Goldstein considered the objective evidence of disability, such as x-rays, to be scarce, and pointed to plaintiff's stress and depression as the probable cause of her problems. He found no evidence that her condition changed over time, and cited the fact that her medical leave had not been ordered by a doctor. He also cited the fact that plaintiff had missed an appointment at one point, and had not seen Dr. Reardon between November 8, 1994, and April 18, 1995. Therefore, he concluded, plaintiff's pain could not be considered disabling.

At trial, Dr. Goldstein conceded that plaintiff's condition was a chronic, waxing and waning problem. He did not contest that plaintiff felt pain and exhibited physical symptoms, and acknowledged that back and knee problems affect different people differently. Dr. Goldstein recognized that plaintiff suffered some functional impairment; he simply opined that this impairment was not total.

This Court assigns no weight to Dr. Goldstein's opinion. Dr. Goldstein is a paid, full-time employee of defendant, who does not specialize in back or knee problems, and who never treated plaintiff, but instead completed a cursory review of the medical records he received.

16. Dr. Reardon explained that the July 11, 1995 date that he had initially reported as the date of plaintiff's disability was used for TDI purposes only. He testified that this was the date he had actually taken plaintiff out of work, and was not necessarily the first date on which she was disabled.

17. Dr. Goldstein's opinion and testimony is crucial because his review of plaintiff's file served as the basis for defendant's denial of plaintiff's claim. The reasons for the denial of plaintiff's appeal, stated by Ann Lorraine Beane, defendant's Group Disability Claim Examiner, in her March 13, 1996 correspondence, reflect Dr. Goldstein's views.

As to Dr. Goldstein's opinion that there was insufficient objective evidence of plaintiff's disability, Dr. Reardon pointed out that the best diagnostic tools for rheumatology are the history and the physical. While x-rays are useful, Dr. Reardon testified, they are not a true monitor of how much pain a patient feels, and are not central to treatment of people with plaintiff's condition. Dr. Goldstein cited a lack of x-rays of plaintiff's knees; Dr. Reardon, however, found that her knee problems were not caused by the sort of traumatic injury which would render x-rays necessary, or particularly useful to his treatment of plaintiff.

In addition, while it is true that plaintiff did not leave work on the orders of a doctor, it is also true that Dr. Reardon discussed plaintiff's leaving work with her during their first meeting, and that plaintiff refused to consider leaving work in light of her financial predicament. More to the point, the Policy does not require that an insured leave work on doctor's orders in order to be considered disabled.

Dr. Goldstein in his notes and testimony repeatedly noted plaintiff's obesity as a contributing factor to her condition. Undoubtedly, her weight exerted additional strain on her back and knees, and added to her problems. However, this is entirely beside the point. The Policy contains neither an "obesity exception" to coverage, nor a clause conferring upon Dr. Goldstein the moral authority to deem a disabling condition the fault of the patient.

Furthermore, Dr. Goldstein's perfunctory conclusion that stress and depression caused plaintiff's problems appears pretextual in light of the long and well-documented history of plaintiff's back and knee pain, and the continuous treatment of that pain with prescribed pain-killing medications. Four different doctors in this case treated or examined plaintiff for her back and knee problems, and not one cited stress and depression as a cause. Moreover, Dr. Rear-

don testified that he was aware of plaintiff's emotional problems, and that depression and stress neither cause pain, nor contributed to plaintiff's condition. Finally, while defendant had no *duty* to do so, it did have the *right* to order an independent medical examination of plaintiff. Dr. Goldstein's failure to recommend such an examination strongly suggests that his findings as to plaintiff's condition were pretextual.

In light of the foregoing evidence, this Court finds that plaintiff's back and knee problems rendered her unable to endure long periods of sitting, standing or driving, and that making the transitions from standing to sitting, and sitting to standing, exacerbated her condition and worsened her pain. As a result of this medical condition, plaintiff was unable to perform the important duties of her occupation, *i.e.*, the extensive traveling from her office to the various destinations as described *supra*.

The Court finds further that plaintiff was so disabled on January 20, 1995, the date on which plaintiff went on medical leave.[18] The Court finds that plaintiff remained so disabled through the elimination period, which ended on July 19, 1995. Dr. Reardon's notes through that period indicate that plaintiff's condition did not change, and he continued to prescribe pain medication and to schedule return visits every three to six weeks. Moreover, the absence of plaintiff's back and knee problems in Dr. Gloor's records during this period is insignificant because Dr. Reardon treated her for those problems, while Dr. Gloor treated her for depression and stress. Finally, while plaintiff took a vacation riding in a car to Maryland, Virginia and Pennsylvania in June 1995, this activity simply does not compare to the rigors of plaintiff's driving duties on the job.

Finally, the Court finds that Dr. Reardon's notes and continuing treatment of plaintiff establish that plaintiff remained disabled through the time of the trial in this case.[19]

18. As a result of this finding, the Court need not determine whether coverage under the Policy continued while plaintiff was on medical leave. The parties agree that plaintiff was eligible for benefits on January 20, 1995.

19. Defendant does not appear to argue that plaintiff's condition has improved; thus, it does not appear to be in dispute that if plaintiff's condition constituted a disability under the Policy on January 20, 1995, it continued to be such thereafter.

## V. Conclusions of Law

The disputes concerning the Policy are: (1) whether plaintiff was disabled within the definition of the Policy, and if so, on a date when covered thereby; (2) whether she remained disabled through the 180–day elimination period, thus entitling her to benefits; and (3) whether the Policy's "psychiatric disorder" limitation applies to bar coverage.

■ With respect to the first issue, the relevant definition of "disabled", as noted *supra*, is:

1. because of injury or sickness, the employee cannot perform the important duties of his own occupation; and

2. the employee is under the regular care of a doctor; and

3. the employee does not work at all.

In light of the Court's findings of fact, it is clear that plaintiff satisfies this definition. Her back and knee problems rendered her unable to perform the important duties of her own occupation; she was under the regular care of Dr. Reardon; and she has not worked since Sawyer terminated her employment in April 1995. Plaintiff was eligible for benefits on January 20, 1995.

In addition, plaintiff remained disabled under the Policy throughout the 180–day elimination period, which ended July 19, 1995, and remained so through the time of the trial of this case.

■ Finally, the "psychiatric disorder" limitation does not apply here. Plaintiff's depression and stress did not cause or contribute to her disability. Even if plaintiff's depression and stress did contribute to her back and knee problems, defendant offered no evidence establishing that these conditions constituted "neurosis, psychoneurosis, psychopathy or psychosis", as contained in the Policy's definition of "psychiatric disorder".

In light of the foregoing, the Court concludes that defendant wrongly denied plaintiff's application for benefits under the Policy, and plaintiff is entitled to recover the benefits due to her as set forth therein, pursuant to 29 U.S.C. § 1132(a)(1)(B).[20]

With respect to the specific amount of the judgment, defendant made the following representation to this Court in its post-trial Reply Memorandum:

> The parties may not have made it clear at the time of trial that Mrs. Grady and Paul Revere agreed as to the amount of benefits which were due if Paul Revere were found to be liable. Although a written stipulation was not submitted, there is an oral agreement since there was no dispute regarding the amount of Mrs. Grady's compensation as of January 20, 1995, the amount of her social security benefits, and the formula for determining what benefits would be payable.

Since the record does not contain that information, it will be necessary to have a hearing to determine the precise amount due to plaintiff as of the date judgment is entered.

Furthermore, while ERISA provides for postjudgment interest to be calculated at the federal rate, as set forth in 28 U.S.C. § 1961(a), *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 224 (1st Cir.1996), prejudgment interest is left to the discretion of the court. As stated in *Cottrill*, "[t]his judicial discretion encompasses not only the overarching question—whether to award prejudgment interest at all—but also subsidiary questions that arise after the court decides to make an award, including matters such as the period and rate to be used in calculating interest." *Id.* at 223. Therefore, it is necessary to have a hearing on this issue.

Finally, plaintiff has requested an award of attorney's fees and costs. 29 U.S.C. § 1132(g) states, "[i]n any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." At the present time, this Court has no basis for a determination of reasonable attorney's fees and costs in this case. Thus, a hearing must be held on that issue.

---

**20.** Given the Court's finding for plaintiff on this ground, her claim under 29 U.S.C. § 1133 need not be addressed.

The appropriate device for plaintiff to use to secure resolution of these issues is a motion for entry of judgment supported by appropriate memoranda and affidavits. Plaintiff will have 30 days after the date hereof to file said motion and supporting documents, and defendant 30 days thereafter to respond. After these filings are completed, the Court will set the matter down for hearing.

## VI. CONCLUSION

The Court concludes and declares that pursuant to 29 U.S.C. § 1132(a)(1)(B), defendant, Paul Revere Life Insurance Company, is liable to pay benefits to plaintiff under Policy Number G–20611, in an amount to be determined at a future hearing of this matter. What, if any, prejudgment interest and/or attorneys' fees and costs will be included in the judgment, shall also be decided at said future hearing. No judgment will enter until the Court resolves all of these outstanding issues.

It is so ordered.